338

SHAMROCK TOWING CO., Inc., as Owner of THE SHAMROCK NO. 80,
Libelant-Appellee,

v.

SCHIAVONE–BONOMO CORPORATION,
Respondent-Appellee,
and
Russell Bros. Towing Co., Inc., Respondent-Impleaded-Appellee,
and
Apex Salvage Corporation, Respondent-Impleaded-Appellant.

WILLIAM J. McCORMACK SAND DIVISION PENN INDUSTRIES, INC.,
Libelant-Appellant,

v.

SHAMROCK TOWING COMPANY, Inc.,
Respondent-Appellee,
and
Schiavone-Bonomo Corporation, Russell Bros. Towing Co., Inc., Respondents-Impleaded-Appellees,
and
Apex Salvage Corporation, Respondent-Impleaded-Appellant.

SCHIAVONE–BONOMO CORPORATION,
Libelant-Appellee,

v.

THE SHAMROCK NO. 80, THE J. RAYMOND RUSSELL, Zeller Marine Corporation, Respondents-Appellees,
and
Apex Salvage Corporation, Respondent-Appellant.

Nos. 101–103, Dockets 25784–25786.

United States Court of Appeals
Second Circuit.

Argued Jan. 5, 1960.

Decided March 2, 1960.

Christopher E. Heckman, New York City (Foley & Martin, James E. Kent, New York City, on the brief), for Shamrock Towing Co., Inc.

Henry C. Eidenbach, New York City (Hill, Rivkins, Middleton, Louis & Warburton, New York City, on the brief), for Schiavone-Bonomo Corporation.

Frank C. Mason, New York City (Mahar & Mason, New York City, on the brief), for Russell Bros. Towing Co., Inc.

Richard Gyory, New York City (Cooper, Ostrin & De Varco, Theodore Siskind, New York, N. Y., on the brief), for Apex Salvage Corporation.

Edward F. Platow, New York City (Platow & Lyon, New York City, on the brief), for William J. McCormack Sand Division, Penn Industries, Inc.

George B. Warburton, New York City (Hill, Rivkins, Middleton, Louis & Warburton, New York City, on the brief), for Schiavone-Bonomo Corporation.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge.

On January 10, 1957 Schiavone-Bonomo Corporation (Schiavone) contracted with Apex Salvage Corporation (Apex) for the purpose of one scow load of approximately 500 gross tons of No. 2 heavy melting steel to be loaded, stowed and trimmed by Apex. The scow Shamrock 80, which had been chartered by Schiavone from its owner Shamrock Towing Co., Inc. (Shamrock), was delivered to Apex's dock in the Bronx River on March 9, 1957. On March 18, following loading and weighing, she was towed by the tug Russell No. 9, owned by Russell Bros. Towing Co., Inc. (Russell), to McCormack Stakeboat No. 2, a distance of approximately one and three quarter miles. The stakeboat was moored in Federal Anchorage No. 11, located in the East River near Rikers Island almost directly across from the mouth of the Bronx River, under a permit granted to William J. McCormack Sand Division, Penn Industries, Inc. (McCormack). Several hours later that afternoon she was picked up by the J. Raymond Russell (another Russell tug) for delivery to Jersey City. The Shamrock 80 was made fast to the port side of D. L. & W. No. 155, a cement lighter already in tow. As the tug began to slowly get underway with the two scows in tow the Shamrock 80 first listed to starboard then careened to port, dumping most of its cargo and damaging her wooden starboard hull against the steel port side of the D. L. & W. No. 155.

As a result of this incident three libels were brought: (1) for hull damage by Shamrock against Schiavone which impleaded Apex and Russell; (2) for loss of cargo by Schiavone against Shamrock, Russell and Apex; * (3) for salvage operations by McCormack against Shamrock which impleaded Apex, Russell, and Schiavone. These actions were consolidated for trial. The trial court found Apex solely at fault for negligent loading of the scow. Schiavone was held secondarily liable for the hull damage based on its non-delegable duty as a charterer. This liability is not contested by Schiavone. Three interlocutory decrees were entered: (1) in favor of libelant Shamrock against Apex primarily and Schiavone secondarily for damages sustained and dismissing the Schiavone petition impleading Russell; (2) in favor of McCormack against Apex for damages sustained and dismissing the McCormack libel against Shamrock and the impleading petitions against Schiavone and Russell; and (3) in favor of Schiavone against Apex for damages sustained and dismissing the Schiavone libel against Shamrock and Russell.

Apex appeals from its liability in all three actions and McCormack appeals in

* Another defendant, Zeller Marine Corporation (the charter broker) was exonerated by the court.

part from the court's refusal to hold Schiavone primarily liable for the salvage operations.

The Shamrock 80, a wooden deck scow, approximately 113 feet in length, 33 feet in width and 8.7 feet in depth, was chartered by Schiavone in December 1956 for an indefinite period. Her captain, Alexander Fau, was supplied by Shamrock. The scrap metal cargo loaded by Apex consisted of automobile chassis, such as, axles, rear ends and gear boxes, cut into two to three foot lengths. These irregular parts were loose and greasy. They were placed on the scow by the use of a crane and a two-ton electro-magnet which lifted between one-half and three-quarters of a ton of scrap per load and scattered it at random in the scow. Two trimmers were employed to interlace the pieces on the sides. The trimmers and the crane operators were employees of Apex.

Loading was commenced on March 11. On Friday, March 15, Fau protested to some employees of Apex that the load was too high but was told that they knew their business and that it was all right. Emanuel Moskowitz, treasurer of Schiavone, testified that following a call from Shamrock informing him that Fau had complained of overloading he called Samuel Bassow, president of Apex, who said to "leave it to him [Bassow] because he had been loading boats for years and there is no difficulty." Bassow could "not recall that conversation" nor could he remember that Magne Hauge, an employee of B. W. King, who measured the tonnage by displacement prior to the time when the scow was towed away on Monday, March 18, told him it was topheavy.

Also, on March 15 Fau told Wilford Roger, the Apex foreman, of a bulge on the starboard side of the stowage. On Saturday, March 16, Roger swung the two-ton magnet several times against the protruding pieces and drove them back into the mass. On the morning of departure Roger used the magnet to straighten out a slight list by shifting the arrangement of scrap on the top.

Fau testified that while this was being done the scow "went like a rubber ball."

The trial court found that the height of the finished cargo was from 15 to 20 feet. This is amply supported by the record. Paul Gilson, captain of the Russell 9, estimated 20 feet; John O'Brien, captain of the J. Raymond Russell, estimated from 12 to 15 feet; Bassow from 13 to 14 feet; Fau said 20 feet, but later calculations, based on measurements while he was standing on top of his cabin and reaching up, place the height at about 16½ feet. Hauge, Gilson, and O'Brien all said it was the highest such load they had ever seen.

There is testimony that when the scow was picked up by the Russell 9 there was only a slight list, if any, and that there was no trouble during the trip to the McCormack stakeboat. About 3:40 in the afternoon the tug, J. Raymond Russell, arrived. The sky was clear and the tide was ebbing towards New York at about two miles per hour. O'Brien noticed a four to six inch list to the port stern and asked Fau if the scow had any water. Fau replied that she was bone dry. The evidence shows that she had the minimum amount of water found in most wooden scows.

After the Shamrock 80 had been secured to the D. L. & W. No. 155 by breast lines and two hawsers run from the stern of the tug to the bows of the scows, the tow was released from the stakeboat and under a dead slow bell and heading towards Long Island Sound, the flotilla drifted with the tide toward New York to clear the stakeboat. Although there is some lack of clarity in O'Brien's testimony as to the tautness of the hawsers, it is clear that the tug had made little or no headway at the time of dumping. He was just commencing a turn to port when his deckhand warned him the scow was listing dangerously and as he straightened the wheel she careened, dumping most of her cargo.

Shamrock sustained the burden of proving that the scow was in seaworthy condition. The cargo weighed approxi-

mately 615 gross tons. Weight of cargo did not cause the accident. The Shamrock 80 had carried heavier loads during the prior year, and inspections made right up to the day of the accident disclosed only minimum seepage. As the trial judge said, "The question is not of the load on the scow but rather the height and stow of the cargo."

■ Apex claims that the barge and the towing company should be held liable or share liability because the barge captain knew of the loading situation and that both tug captains observed the height of the load. Apex also asserts that the second Russell tug was negligent in its maneuvering. There is no evidence of any abrupt turns or pull on the hawsers which might have caused the scow to careen. Allowing a tow to drift in order to float clear of a stakeboat does not amount to negligence. No navigational fault was established. Nor is there any inconsistency between the fact that the height of the load was creating an unstable condition and the trial court's finding that the scow "was not so obviously unfit for towing as to put the tug captains on notice that it would be negligent to proceed with the tow" because Apex had actual knowledge of the unstable action of the barge when so loaded whereas the tug captains did not.

The extreme height of the cargo resulted in a top heavy condition which was apparently the main cause of the dumping. Fau's colorful description of the "rubber ball" shifting as each magnetful was moved on the top is significant. Other facts had varying effect on its stability: the greasy nature of the cargo, the irregular lengths, and the interlacing by the trimmers which had to be corrected on one occasion by use of the magnet as a pendulum to force the bulging starboard pieces inward.

The district court found that the visible height and list were not sufficient to put the tug captains on notice so as to charge them with negligence for attempting to pick up the Shamrock 80. Since "the burden of proof is upon the party seeking to charge the tug with liability" this finding was justified (Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47).

■ Apex further contends that Fau directed the loading. Under its contract with Schiavone Apex was to load, stow and trim the cargo. It was to its financial advantage to load as much as possible. The loaders were all employees of Apex. Although on complaints from Fau Apex did take care of the starboard bulge and shift cargo at the top on the morning of departure, when warned of the excessive height it assured both Fau and Moskowitz that it had experience in loading and knew what it was doing. Apex clearly controlled the loading operations and is liable for the damages resulting from its negligence (Hastorf Contracting Co. v. Ocean Transportation Corporation, D.C.S.D.N.Y.1923, 4 F.2d 583, affirmed, 4 Cir., 4 F.2d 584). Although a barge captain may be responsible for giving notice of, and avoiding, an overload (there is no claim of overload here), he was not burdened with directing or supervising the manner of loading the scow. This task was undertaken by Apex over which he had no authority or control.

As to the salvage operations, Schiavone originally engaged Merritt, Chapman & Scott Corporation to remove the submerged scrap. They recovered approximately 430 tons. As all of the debris was not removed, McCormack and Schiavone subsequently engaged Island Marine Co. to conduct further salvage operations. In this latter contract, Schiavone agreed to purchase any scrap recovered.

■ The negligence of Apex caused the dumping of the scrap which rendered the use of the waters in and around McCormack's stakeboat dangerous to navigation. Apex claims that it is not liable for the obligation of McCormack to clear these waters. Apex created a private as well as a public nuisance for which it is accountable.

■ There is no authority for holding Schiavone liable to McCormack with a

right over against Apex. A nuisance may be committed by negligence or willfulness but mere ownership of the material imposes no liability. Accordingly, McCormack's appeal is without merit.

Decree affirmed.