**MARINE SALES & SERVICE, INC., a corporation, and Hartford Fire Insurance Company, a corporation, Plaintiffs,**

**v.**

**GREER STEEL COMPANY, a corporation, Defendant.**

**Civ. A. No. 68–12–F.**

United States District Court,
N. D. West Virginia,
Fairmont Division.

May 7, 1970.

Herschel Rose, Fairmont, W. Va., for plaintiffs.

Oscar J. Andre, Steptoe & Johnson, Clarksburg, W. Va., for defendant.

CHRISTIE, District Judge:

This action was originally brought by Marine Sales & Service, Inc., against Greer Steel Company to recover damages to a barge allegedly caused by improper loading by Greer. Greer denies the allegation. The barge, owned by Marine Sales & Service, buckled near its midsection shortly after it was loaded with limestone chips by Greer at the latter's landing facilities on the Monongahela River near Morgantown, West Virginia. The loss, with exception of $500.00 deductible, was insured against by Marine Sales & Service's insurance carrier, Hartford Fire Insurance Company. The loss was later adjusted on the basis of a total damage of $7,390.32 and that sum, less $500.00 deductible, was paid by Hartford to Marine Sales & Service, who thereupon issued a subrogation agreement to Hartford for the amount so paid. On motion of the defendant, under Rule 19(a) of the Federal Rules of Civil Procedure, that Hartford Fire Insurance Company was a real party in interest, it was made a party plaintiff jointly with Marine Sales & Service herein.

## FINDINGS OF FACT

1. Plaintiff Marine Sales & Service, Inc., is a corporation with offices in Charleroi, Pennsylvania. It is engaged in the operation of towboats and barges carrying coal, crushed limestone, limestone rock, and other such commodities on the Monongahela River and other rivers in Pennsylvania and West Virginia.

2. Plaintiff Hartford Insurance Company is a corporation with offices at Hartford, Connecticut. It is engaged in the general insurance business and it insured barges of Marine Sales & Service, Inc., against the risk of damages from buckling, with a $500.00 deductible provision, including Barge MS116 involved in this case.

3. Defendant Greer Steel Company is a corporation with offices at Morgantown, West Virginia. It operates a limestone quarry located about ten miles from Morgantown, from which it produces limestone rock, limestone chips, and similar products. It operates a loading dock on the Monongahela River at Morgantown, where it loads barges

with its various products to be transported on the Monongahela River. The Monongahela is a navigable river.

4. Among its barges, Marine Sales & Service owned one designated as MS116 at the time of the incident with which we are here concerned. It purchased the barge from the Ohio River Company in August 1965 for $2500.00. At that time the barge was about nineteen years old and was in a damaged condition, having buckled near the center and having sustained other damages which were repaired by Consolidated Coal Company Marine Ways, at Elizabeth, Pennsylvania, at a cost of $3,940.-35. Thereafter, the barge was used regularly by Marine Sales & Service in transporting coal and crushed limestone on the Monongahela River and upper Ohio River until July 25, 1966. During this time the barge was not involved in any accident or casualty causing any damage to it. It was 175 feet in length, 26 feet in width, and 11 feet in depth. It was of steel construction with an exterior hull and an interior hopper. The deck of the hopper was of wood construction. Its maximum capacity was 1,000 tons.

5. During the months of May, June and July, 1966, terminating July 23, 1966, the barge had been taken to the Greer dock at Morgantown on seven separate occasions and each time had been loaded with cargoes of limestone sand or limestone chips ranging from 817 to 883 tons without difficulty or damage. Limestone sand is similar to limestone chips except the components are somewhat smaller in size.

6. On July 25, 1966, at approximately 6:00 p. m., a Marine Sales & Service diesel-powered towboat, manned by Marine Sales & Service employees, delivered the MS116 to the Greer landing at Morgantown. The barge had been ordered by an employee of Greer who was in charge of the defendant's limestone plant and landing and was to be loaded by Greer with limestone chips for delivery to the Gavelich Construction Company, a customer of Greer, at the customer's landing on the Monongahela River about sixteen miles north of Pittsburgh. At the time the barge was delivered to the landing no employees of Greer were present or on duty, the barge being secured by Marine Sales & Service employees at the landing beneath a chute for loading the limestone chips.

7. The next morning, preparatory to loading the barge, defendant's employees inspected it internally and externally for water, leaks or damage. The internal inspection was accomplished by two employees going down through pumpholes into the interior of the barge and traversing for the barge's full length, one on each side of the barge, the space between the cargo deck, or inner barge, and the outer barge. This inspection revealed that the MS116 was dry, had no holes, cracks, bends, leaks, evidence of deterioration or other damage, and that the barge was in apparent good condition. Thereafter the loading commenced.

8. The chips to be loaded were transported from the quarry to the landing by motor trucks of varying capacities, from 15 to 25 tons. It was understood between Marine Sales & Service and Greer that the load of the barge was to be limited to approximately 850 tons due to channel conditions on the Monongahela River, although the barge had a maximum capacity of 1,000 tons. The limestone was not weighed or measured at the landing, but was weighed at the limestone quarry or plant at the time it was loaded into the trucks. The entire amount dispatched from the plant was, therefore, loaded into the barge by Greer's employees at the landing. It approximated 850 tons.

9. The loading facilities at the landing consisted of a bin or hopper into which the trucks dumped their loads. From the hopper a conveyer belt transported the limestone chips to a loading chute which projected over the barge to be loaded. The loading chute was so constructed that it could be moved by its operator so as to deposit the limestone chips in the particular portion of the

barge desired by the operator. It was standard and accepted practice in the river transportation trade on the Monongahela River and upper Ohio River, when loading river barges with coal or crushed limestone, to load the barges in three "passes," that is, the barge, in addition to being secured beneath the loading chute at the landing, had steel cables at either end running to an electric winch controlled by the loading operator by which it was positioned under the loading chute so that one end of the interior hopper was immediately under the chute. A portion of the load was then deposited through the chute on the barge deck at that point; by means of the winch the barge was moved a short distance and another pile of limestone chips was deposited; the barge was then moved again and the process was repeated until the other end of the barge was reached, making eight piles of limestone chips on the deck of the barge in the course of such first "pass." Then the process was reversed, depositing limestone chips between the eight piles created by the first "pass" until the opposite end of the barge was reached. During these first two "passes," the majority of the load was installed. Then a third "pass" was made to deposit the remainder of the load, evening up the piles. Marine Sales & Service gave the defendant no specific instructions as to how the barge was to be loaded in order to keep from damaging the barge. However, the standing practice prevailing in the river transportation trade, of which the defendant's employees were fully aware, was that the load of limestone chips be evenly distributed over the bottom of the hopper, the purpose being to equalize the load so that the barge would float evenly in the river.

10. The freeboard of the barge was measured by an employee of the defendant during the time the barge was being loaded. These measurements were for the purpose of determining whether the barge was in trim, both transversely and longitudinally, however, such measurements did not in any way determine the proportion of the load that was being placed in any given part of the barge.

11. The loading of the barge took approximately four hours. No one took part in the loading operation except employees of the defendant and no employees of Marine Sales & Service were present during the loading or took any part therein. After the barge was loaded it was moved a short distance to a cell or pier at the Greer landing to be secured to await the arrival of Marine Sales & Service's towboat which would tow it to Greer's customer's landing on the Monongahela River north of Pittsburgh.

12. Approximately fifteen minutes after the loaded barge had been moved to the holding cell or pier, and while one of the defendant's employees was still on the barge completing the securing of it, the barge suddenly buckled in the approximate middle. The buckling was accompanied by a large dull thud or a cracking sound like the breaking of a board. It did not sink but at the point where it buckled it subsided to within a matter of inches of the water surface on one side. The buckled portion extended over approximately ten feet of the length of the barge in its midsection.

13. Being informed in some manner that the barge had buckled, a Marine Sales & Service towboat which had been up-river from the Greer dock, came to the Greer landing. Greer employees took no measures to secure or preserve the barge and its cargo after the buckling occurred, leaving this entirely to Marine Sales & Service. Marine Sales & Service, after employing a welding concern to burn holes in the deck of the barge, inserted pumps and stood by with its towboat to furnish electric power to operate the pumps. Thereafter Marine Sales & Service employed McClain Sand & Gravel Company to furnish a derrick which was transported to the scene by another Marine Sales & Service towboat. This derrick unloaded a portion of the limestone chips from the buckled barge

into another Marine Sales & Service barge. Then both barges, containing the original tonnage, were towed by Marine Sales & Service to Gavelich's landing at South Heights, Pennsylvania. After the MS116 was completely unloaded there, it was taken to Marine Sales & Service's pier at Dunlevy, Pennsylvania, where it was surveyed and inspected. From there it was taken to the marine ways of Jones & Laughlin Steel Company, at Floreffe, Pennsylvania, where the necessary underwater repairs were made at a cost of $2,665.36. The underwater repairs consisted of renewal of two side plates, two hopper plates and two gun plates. The barge was then returned to Marine Sales & Service's Dunlevy landing where Marine Sales & Service alleges other needed repairs were accomplished by its own personnel, but it has produced no records to show the nature, extent and amount of such repairs, nor has it adduced any oral testimony in the record from which any reasonably accurate estimate of such repairs could be reached. However, Marine Sales & Service did incur $2,253.90 in reasonable and necessary expense in the defense, safeguard and recovery of the barge. The several items of this expense are: $8.90 for burning hole in hull to permit insertion of pumps, $640.00 for stand-by motor vessel Monongalia, $1,155.00 for motor vessel Kay H in bringing derrick to the stricken barge and returning same, and for bringing another barge there for offloading purposes, and $450.00 for use of derrick in offloading.

14. The evidence as to the market value of the barge immediately before and after the buckling ranges from $8,000.00 to $10,000.00 before and $1,000.00 to $3,000.00 after. However, the loss here is not measurable by the concept of market value immediately before and immediately after because the evidence does not justify a finding of a constructive total loss.

15. Hartford made adjustment of the loss, according to the testimony of William R. Deramo, its Marine Loss Supervisor, with Marine Sales & Service upon the premise that the damage was repairable; not on the basis of a constructive total loss. He testified that the estimated repair cost ranged from $6,000.00 to $7,000.00 and he used the mean of the two, or $6,500.00, as a base. The actual repair cost, however, as proved at trial was $2,665.36. It is, of course, conceivable that the repairs allegedly made by Marine Sales & Service itself would explain the discrepancy, but the record is devoid of any proof thereof. We likewise find no proof in the record upon which to postulate a finding of money damages for deprivation of use. Marine Sales & Service's true loss, therefore, is the Jones & Laughlin repair bill of $2,665.36 and $2,253.90, representing items of expense to which it was placed in defending, safeguarding and recovering the barge, or the total sum of $4,919.26.

## CONCLUSIONS OF LAW

1. This is a case of admiralty and maritime jurisdiction and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has jurisdiction of this action and its jurisdiction is conceded.

2. The relationship of bailor and bailee existed between Maritime Sales & Service and Greer Steel Company as to Barge MS116 at the time the barge was loaded and at the time it buckled shortly thereafter. When a bailor-bailee relationship is entered into for the mutual benefit of the parties, as in the present case, the bailee is obligated to exercise ordinary care to protect the subject of the bailment from loss, damage or destruction. Such obligation requires the bailee to exercise the same degree of care that a man of ordinary prudence would exercise under similar circumstances. Orrell v. Wilmington Iron Works, Inc., 185 F.2d 181 (4th Cir. 1950). Failure to exercise that degree of care on the part of the bailee, directly and proximately resulting in a loss of the subject of the bailment, is negligence and gives rise to liability on the part of the bailee.

 3. Negligence of the bailee proximately resulting in damage to the subject of the bailment is the fact upon which the bailor's right of recovery is based, and the burden of proof of such fact rests upon the bailor. Seaboard Sand & Gravel Corporation v. American Stevedores, Inc., 151 F.2d 846, 847 (2nd Cir. 1945). However, the bailor by proving delivery of the subject of the bailment to the bailee in good condition and the failure or refusal of the bailee to return the property in good condition makes out a *prima facie* case of negligence, imposing upon the defendant-bailee the duty of "going forward" with evidence showing that he exercised ordinary care or that the damage or loss was due to causes other than his failure to exercise such care. Orrell v. Wilmington Iron Works, Inc., supra. The defendant-bailee can satisfy this burden by producing explanatory evidence tending to exonerate himself from fault. The burden is then on the plaintiff-bailor to show that the negligence of the bailee contributed to the loss or damage. Thus, though the burden of "going forward" with the evidence may shift during the trial, if explanatory evidence is produced by the defendant-bailee the ultimate burden of proof or the "risk of nonpersuasion" rests upon the plaintiff-bailor. This shifting of the burden of "going forward" with the evidence is solely a procedural device and once rebuttal evidence has been offered by the defendant-bailee, the question of "going forward" is removed from the case leaving the ultimate burden of proving the bailee's negligence with the plaintiff-bailor. Richmond Sand & Gravel Corporation v. Tidewater Const. Corporation, 170 F.2d 392 (4th Cir. 1948); Lafayette Coal Company v. Burge, 411 F.2d 1168 (6th Cir. 1969); Seaboard Sand & Gravel v. American Stevedores, Inc., supra.

 4. Applying the facts of the instant case to the law of bailment as thus announced, we conclude that the plaintiffs have borne their burden and established by satisfactory proof that the barge in question was in reasonably good condition and fit for its intended use when delivered into the custody of the defendant Greer, and that its subsequent buckling was proximately caused by the negligence of Greer's agents and employees in that they negligently employed loading procedures which concentrated too much of the load in the midsection in relation to the load on either end and which procedures were not in keeping with the custom and practice for loading barges with limestone and other heavy materials in the industry. Thus the defendant must respond for the resultant damage.

 5. Where there is not a constructive total loss but the craft is physically and economically repairable and the repair cost does not exceed the just value of the craft at the time of the casualty, the measure of damages is the cost of the repairs, the expense of reclamation and an allowance for deprivation of use, Hewlett v. Barge Bertie, 418 F.2d 654 (4th Cir. 1969).

6. Thus the plaintiffs shall have judgment against the defendant for the sum of $4,919.26, with interest and costs as provided by law.