**DRAVO MECHLING CORPORATION, Plaintiff,**

v.

**STANDARD TERMINALS, INC., Defendant.**

Civ. A. No. 80–251.

United States District Court, W.D. Pennsylvania.

Feb. 22, 1983.

Norman J. Cowie, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for plaintiff.

Stephen W. Graffam, Grogan, Graffam, McGinley, Solomon & Lucchino, Pittsburgh, Pa., for defendant.

## OPINION

MANSMANN, District Judge.

Plaintiff Dravo Mechling Corporation[1] brought this action as a result of the buckling and sinking of its barge. Plaintiff alleges that Defendant Standard Terminals, Inc. improperly loaded the barge, thereby causing it to buckle. The case was tried before this Court nonjury.[2] We hereby make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a):

## FINDINGS OF FACT

Plaintiff Dravo Mechling Corporation has its principal place of business at Pittsburgh, Pennsylvania. At all times material herein, Union Mechling Corporation, or its successor, Dravo Mechling Corporation, was the owner of the Barge UMC–1140.

Defendant Standard Terminals, Inc. has its principal place of business at New Kensington, Pennsylvania. Defendant handles truck, rail and river traffic. The loading and unloading of barges are among its operations. Defendant has a loading dock on the Allegheny River near New Kensington.

In April 1979, Plaintiff entered into a contract of carriage with Bethlehem Steel Corporation ("Bethlehem Steel") under which Plaintiff agreed to transport manganese ore provided by Bethlehem Steel.[3] The ore was to be transported in bulk, by

---

1. The Plaintiff originally named in the case caption was Union Mechling Corporation. The Court subsequently permitted the substitution of Dravo Mechling Corporation, successor to Union Mechling Corporation, as Plaintiff in the suit and the caption was amended accordingly.

2. In a nonjury trial, the functions of finder of fact and decider of law are merged in the trial judge. As finder of fact, the judge must pass upon the credibility of the witnesses and must draw reasonable inferences from the evidence presented. *Ruiz v. Estelle,* 679 F.2d 1115, 1131 (5th Cir.1982); *Charles Schmitt & Co. v. Barrett,* 670 F.2d 802, 805 (8th Cir.1982).

3. Bethlehem Steel is not a party to this action. In this regard, there is no evidence that the cargo was damaged by the sinking of the barge. In fact, the parties have stipulated that manganese ore is not water sensitive.

barge from New Kensington to Calvert City, Kentucky.

From April through the period in question, the ore was delivered to Defendant's terminal at New Kensington on a twice-weekly basis. Specifically, the ore was dumped onto a pad next to Defendant's crane. Plaintiff would drop off one of its barges at the terminal site near Defendant's hoist. Defendant would load the ore from the dock into the barge. Upon notification, Plaintiff would pick up the loaded barge.

The barges were selected by Plaintiff. Defendant, however, as a matter of standard practice, inspected the barges before loading them. Several times, Defendant's inspection resulted in repairs of a barge, performed either by Plaintiff or by Defendant.

Plaintiff did not participate in the loading of cargo into the barges. Defendant, on the other hand, did not participate in the transportation of the cargo once the barges were picked up by Plaintiff.

On August 27, 1979, Plaintiff delivered the Barge UMC–1140 ("1140") to Defendant's loading dock.

The 1140 was a steel-welded, jumbo hopper barge with eight covers. The barge was 195 feet long, 35 feet wide and 11 feet from its gunwales to its bottom exterior hull plates. It had a rake end and a box stern. The barge was approximately 20 years old in 1979.

The 1140 was seaworthy and in sound condition at the time of its delivery to Defendant's dock. The barge had no notable defects or problems and it was sitting level in the water. Indeed, the evidence indicates that the 1140 was in "above average"

condition at the time. The barge could withstand the normal rigors of loading and towing. Moreover, it was fit for the service intended by Plaintiff.

Defendant did not object to the 1140 after inspecting it nor is there any evidence that any repairs were found necessary. Defendant's employees proceeded to load the barge with 1456 net tons of manganese ore. The loading began on August 27 and was completed the following day. After loading the barge, Defendant's employees closed all of the covers that had been opened during the loading process.[4]

At Plaintiff's request, Imperial Towing, Inc. ("Imperial Towing") dispatched a vessel, the M/V Sunflower ("Sunflower"), to Defendant's landing to pick up the loaded Barge UMC–1140.[5] The Sunflower picked up the barge at approximately 9:30 p.m. on August 29, 1979 and delivered it to Plaintiff's Georgetown, Pennsylvania landing at 2:00 p.m. on August 31, 1979.

There is no evidence that the crew of the Sunflower used less than reasonable care in making up its tow and transporting the 1140 to Georgetown.[6] Further, the captain and pilot of the Sunflower testified that the "haul" to Georgetown was without incident. They observed nothing unusual about the 1140 and they encountered no notable difficulties in transporting the barge to Georgetown.

At Georgetown, the 1140 was placed in the tow of the vessel, the M/V Roy Mechling ("Roy Mechling") with the assistance of the Sunflower's crew. The Roy Mechling is owned and operated by Plaintiff.

The 1140 was secured so that it was "face up" to the Roy Mechling. There is no evidence that the barge was secured improper-

---

4. One of Defendant's employees who had finished loading the barge on August 28 testified that he could not move the eighth cover. He further testified, however, that he felt he could properly load the barge even with the cover in place.

5. Imperial Towing owns the M/V Sunflower. Imperial Towing is not a party to this action.

6. The crew of the Sunflower tied off the 1140 at the Wabash pier on the morning of August 30, 1979 while they handled other loads. They picked up the barge again that night and proceeded to Georgetown. The testimony showed that many vessels at that time tied off barges at the Wabash pier. Moreover, the Sunflower passed the pier several times during the day of August 30. They observed nothing unusual about the 1140 either then or when they picked it up again that night.

ly or in an unusual manner. The record suggests that reasonable care was used in making up the tow which included six empty barges as well as the loaded 1140.

The Roy Mechling left Georgetown with its tow at 8:30 a.m. on September 1, 1979. It travelled about 15 to 16 miles to the New Cumberland lock. Nothing unusual was observed with regard to the 1140 or to the rest of the tow during this time. The Roy Mechling was traveling at a fairly constant speed of about nine miles per hour, slowing down as it approached the lock. The evidence indicates that the crew of the Roy Mechling used reasonable care as they transported the 1140 to the New Cumberland lock.

The Roy Mechling arrived at the New Cumberland lock at 10:10 a.m. Normal procedure was followed in taking the tow through the lock. Nothing unusual was observed at this time and the record indicates that due care was used.

The Roy Mechling left the New Cumberland lock at 10:35 a.m., turning slowly out into the river. The vessel gained speed after it straightened out, getting up to five or six miles per hour.

At 10:45 a.m., when the Roy Mechling had traveled about a mile from the New Cumberland lock, the 1140 buckled. The bow of the barge came up; the middle of the barge and then its stern went down. The Roy Mechling unsuccessfully attempted to get the barge to shore. The 1140 sank at Mile 55.6 on the Ohio River. The crew of the Roy Mechling used reasonable care during their vessel's journey from the New Cumberland lock to Mile 55.6 and during the actual sinking of the 1140.

An inspection of the cargo after the sinking of the 1140 revealed that the ore was concentrated in the center section of the barge in one large pile, reposing at a very steep angle. There was no ore at all in at least the first 20 feet of the stern end. A crane operator [7] who removed the ore from the sunken barge testified that he also

could find no ore in at least the first 10 feet of the bow or rake end. Further, the ore was situated irregularly between the port and starboard sides of the barge even where it was concentrated.

The concentration of the cargo in the midsection of the 1140 did not result from the buckling of the barge nor did it result from any other occurrence during the voyage from New Kensington. We note in this regard that manganese is a very heavy ore which does not materially shift position once it is loaded. The location and configuration of the ore was the direct result of the manner in which it was loaded.

The loading of the manganese ore by Defendant in a way which concentrated most of the ore in the midsection of the barge was improper and negligent. Defendant's negligence was the sole proximate cause of the subsequent buckling and sinking of the 1140.

Plaintiff necessarily incurred certain expenses as a proximate result of the casualty. These payments, which were fair and reasonable, are as follows:

| 1. | Howard Klein (diver's services):<br>Payment made on September 12, 1979. | $ 1,165.65 |
|---|---|---|
| 2. | John P. Colletti & Associates (marine surveyor's services):<br>Payment made on October 26, 1979. | $ 2,895.90 |
| 3. | Allegheny Marine Salvage Inc. (salvage services):<br>Payment made on September 19, 1979. | $ 30,522.25 |
| 4. | C. & C. Marine Maintenance Company (repairs):<br>Payment made on November 5, 1979. | $ 880.00 |
| 5. | Dravo Corporation (drydocking services):<br>Payment made on November 5, 1979. | $ 451.00 |

At the time of the casualty, the 1140 was worth approximately $55,000. Plaintiff received $9000 from the sale of the salvaged barge which was a fair and reasonable fig-

---

7. The crane operator is employed by Allegheny Marine Salvage, Inc. The salvage company is not a party to this action.

ure. Therefore, Plaintiff's loss with respect to the value of the barge was $46,000. The 1140 was determined to be a constructive total loss on September 21, 1979.

Plaintiff is a wholly owned subsidiary of Dravo Corporation. By arrangement with the parent corporation, all the money which Plaintiff borrows or loans is borrowed or loaned from the parent corporation at the prime interest rate charged at the time of the transaction by Mellon Bank, N.A.[8]

## CONCLUSIONS OF LAW

This case arises under the admiralty and maritime jurisdiction of this Court. *See* U.S. Const. art. III, sec. 2, cl. 1; 28 U.S.C. sec. 1333(1). The case presents an admiralty or maritime claim within the meaning of Fed.R.Civ.P. 9(h).

 Under maritime law, the owner of a vessel has an implied duty to furnish the vessel in a seaworthy condition. *The Southwark*, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903). The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo it has undertaken to transport. *Id.* at 9, 24 S.Ct. at 3. *See also The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898). Generally, the issue of seaworthiness is a factual question. *See PPG Industries, Inc. v. Ashland Oil Co.—Thomas Petroleum Transit Div.*, 592 F.2d 138, 146 (3d Cir.1978), *cert. denied*, 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979).

We have already determined that at the time of delivery to Defendant for loading, the 1140 was sound and seaworthy, fit for the service intended by Plaintiff.

 There are at least two legal theories under which Defendant may be held liable: a bailment theory and a warranty theory.

Under the first theory, the delivery of the 1140 to Defendant for loading created a bailment. Where as here, the bailor-bailee relationship is to the mutual benefit of both parties, the bailee is obligated to exercise ordinary care with respect to the subject of the bailment. *See Continental Nat'l Am. Group v. Valley Line Co.*, 420 F.Supp. 568, 570 (E.D.Mo.1976); *Marine Sales & Service, Inc. v. Greer Steel Co.*, 312 F.Supp. 718, 722 (N.D.W.Va.1970). If the bailee's failure to exercise due care proximately results in the loss of the subject of the bailment, the bailee is liable in negligence. *See* 312 F.Supp. at 722.

In the instant case, Defendant received exclusive custody and control of the 1140 for the purpose of loading the barge with manganese ore. Defendant failed to exercise due care when it loaded the barge. In this regard, loading the 1140 so that most of the ore was concentrated in the midsection of the barge was improper and negligent. Defendant's negligence proximately caused the barge to buckle and sink. Thus, Defendant is liable for its failure to exercise ordinary care as the bailee of Plaintiff's barge.

 Under the second theory, Defendant's improper manner of loading the 1140 may be considered a breach of the stevedore's warranty of workmanlike service. *See Ryan Stevedoring Co. v. Pan-Atlantic Steamship Co.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956).[9] It has been said that the warranty of workmanlike performance requires the stevedore to use such care and diligence as an ordinarily prudent and skillful person would use in the same circumstances. *F.J. Walker Ltd. v. Motor Vessel "Lemon Core,"* 561 F.2d 1138, 1148 (5th Cir.1977). In other words, ordinary care is required of the stevedore. Breach of the stevedore's warranty results in its liability for all foreseeable and proximate losses. *See generally Salter Marine, Inc. v. Conti Carriers and Terminals, Inc.*, 677 F.2d 388, 390 (4th Cir.1982).

Defendant, in its capacity of stevedore, failed to exercise due care in the loading of

---

8. Mellon Bank, N.A. is headquartered in Pittsburgh, Pennsylvania.

9. *See generally Federal Commerce & Navigation Co. v. Calcumet Harbor Terminals, Inc.*,

542 F.2d 437, 441 (7th Cir.1976); *Thompson v. Trent Maritime Co.*, 353 F.2d 632, 637 (3d Cir. 1965).

the 1140. Such failure can be considered a breach of Defendant's warranty of workmanlike service. Since the buckling and sinking of the barge is a foreseeable and proximate result of the Defendant's breach, Defendant is liable.

Regardless of which legal theory is applied, Defendant is clearly liable for its improper and negligent loading of Plaintiff's barge. *See Mechling Barge Lines v. Reynolds Metals Co.,* 1974 A.M.C. 975 (S.D. Tex.1974); *Shamrock Towing Co. v. Schiavone-Bonomo Corp.,* 173 F.Supp. 39, 43–44 (S.D.N.Y.1959), *aff'd,* 275 F.2d 338 (2d Cir. 1960).

■ We note that Plaintiff was under no duty to inspect or supervise the cargo loading operation. *See Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 172, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981).[10]

Plaintiff is entitled to recover as damages the following items:

| | | |
|---|---|---|
| 1. | Diver's services | $ 1,165.65 |
| 2. | Marine surveyor's services | $ 2,895.90 |
| 3. | Salvage services | $ 30,522.25 |
| 4. | Repairs | $ 880.00 |
| 5. | Drydocking services | $ 451.00 |
| 6. | Loss of barge value | $ 46,000.00 |
| | | $ 81,914.80 |

■ Finally, we must award prejudgment interest unless we determine that exceptional circumstances exist which would make such an award inequitable. *See In re Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982).

Generally, such circumstances exist only when the party requesting prejudgment interest has (1) unreasonably delayed in the prosecution of its claim, (2) made a bad faith estimate of its damages so as to preclude settlement, or (3) not sustained any actual damages. *Id.*

■ None of these circumstances are present in the instant case. Therefore, Plaintiff is entitled to prejudgment interest.

For each item of Plaintiff's damages, the interest shall run from the date of payment with respect to that item.[11] With regard to the loss of the value of the 1140, the interest shall run from the date upon which the barge was determined to be a constructive total loss.

Plaintiff shall submit a proposed rate of prejudgment interest to this Court by the date specified in the attached Order.[12] Plaintiff's calculations in support of its proposed rate must be shown. Defendant may respond to Plaintiff's proposal, if it so desires, by a date also specified in the Order.

An appropriate Order will issue.

## ORDER

And now, this 22d day of February, 1983, in light of the foregoing Opinion, judgment is hereby entered in favor of Plaintiff and against Defendant in the amount of $81,-914.80 plus interest to date of judgment at a rate yet to be determined.

---

**10.** We also note that Imperial Towing, Inc., as owner of the Sunflower, was obligated to use such reasonable care and maritime skill as prudent navigators use in performing similar services. *Stevens v. The White City,* 285 U.S. 195, 202, 52 S.Ct. 347, 349–50, 76 L.Ed. 699 (1932). The record indicates that Imperial Towing did in fact use reasonable care.

**11.** The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the date of such loss until the date judgment is entered. 658 F.2d at 108. Therefore, such interest is calculated from the date(s) the payments are made. *Id.* at 112.

**12.** The rate of prejudgment interest is a matter within the discretion of the trial court. 658

F.2d at 112. The rate should be set in a manner consistent with the record before the Court. *See Arco Pipeline Co. v. SS Trade Star,* 693 F.2d 280 (3d Cir.1982).

Plaintiff has already proposed a rate of 16.7% which is the weighted average prime interest rate charged by Mellon Bank, N.A. for the period from September 21, 1979 through August 13, 1982. We do not disagree with Plaintiff's use of the weighted average prime interest rate charged by Mellon Bank as the measure of the prejudgment interest rate in this case. Prejudgment interest, however, is computed to the date of judgment. Therefore, the time period used by Plaintiffs as the basis for the calculation of the rate is inappropriate.

Plaintiff shall submit a proposed rate of prejudgment interest by March 9, 1983. Defendant shall have until March 18, 1983 to respond, if it so desires.