**ST. PAUL FIRE AND MARINE INSURANCE CO., Plaintiff,**

v.

**CONAGRA, INC., Defendant.**

No. 91–799A(5).

United States District Court, E.D. Missouri, E.D.

Oct. 20, 1993.

James W. Herron, Lewis and Rice, St. Louis, MO, for plaintiff.

Joseph A. Murphy, Lucas and Murphy, St. Louis, MO, for defendant.

## MEMORANDUM OPINION

LIMBAUGH, District Judge.

This matter is before the Court for a decision on the merits after trial to the Court on July 15 and 16, 1992, sitting in admiralty. This suit concerns the sinking of the Barge ART–629B on August 11, 1989 while being loaded by defendant Conagra at its Peabody dock on the Mississippi River in the St. Louis Harbor. Plaintiff St. Paul Fire and Marine Insurance filed this action against Conagra, as subrogee of its insured American River Transportation Co. (ARTCO), pursuant to 28 U.S.C. § 1333. Plaintiff alleges that the sinking of the barge was the result of negligent loading by defendant's employees. Conagra contends that the buckling and sinking of the barge was due to its unseaworthy condition at the time it was being loaded; and that the unseaworthy condition was due to a latent defect in the barge's hull undiscoverable by the defendant prior to loading.

After due consideration of the testimony and exhibits introduced at trial, and the parties' stipulations and briefs, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 Fed. R.Civ.P. All objections to trial evidence taken with the case are now overruled.

American River Transportation Co. (ARTCO) is and was, at all relevant times, the owner pro hac vice and operator of Barge ART–629B, a steel hulled river hopper barge. Archer–Daniels–Midland Company was, at all relevant times, the owner of said barge and the parent company of ARTCO.

At all relevant times, plaintiff St. Paul Fire and Marine Insurance Co. was a corporation engaged in the issuance of contracts of marine insurance covering barges and cargoes on the Inland River System.

At all relevant times, defendant Conagra is and was a corporation engaged in the business of loading barges with cargo for transportation on the Inland River System, including the Mississippi River and its tributaries. At the time of the sinking, Conagra operated the loading facility known as the Peabody Coal Dock (hereinafter referred to as simply the Peabody Dock) in the St. Louis Harbor at or about Mile 179.3 on the left descending bank of the Upper Mississippi River.

The Peabody Dock consists of a series of cells in the river which are somewhat parallel to the bank to which the barges are tied off. The standard method of loading utilized by Conagra is to load from a single loading chute located between two of the cells and move the barges underneath the loading chute. This chute may be moved to load barges from side to side, but in order to load a barge from bow to stern, the barge is moved upriver by the use of a winch wire attached to the barge. The barges are moved downriver by slacking the winch wire and letting the current carry the barges downriver. The barges are kept in against the cells by breast wires so that they remain stabilized for loading.

On August 11, 1989 Barge ART–629B was in the care, custody, and control of Conagra which was engaged in loading it with a bulk cargo of iron ore pellets. Barge ART–629B was one of eighteen barges that Conagra was loading with iron ore pellets for Inland Steel Co. Iron ore pellets is a high density, heavy material cargo.

Barge ART–629B was approximately 200 feet long and 35 feet wide, with four wing compartments of roughly equal length on each side extending through the inner bottom from the starboard to the port side of the Barge, and a stern and a bow compartment. These compartments were separated by bulk heads. The cargo box measured approximately 28 foot 6 inches by 188 feet. The wing tanks opened into a double bottom of the Barge. There was no bow to stern divider in the double bottom so that each wing tank ran from side to side of the Barge through the double bottom. The Barge was equipped with nine fiberglass lift covers which had been stacked at each end of the cargo box prior to the barge being placed at the Peabody Dock for loading.

The Barge was constructed by Nashville Bridge Company and placed in service in 1980. The Barge was constructed by the use of prefabricated sections. The bottom of the Barge was laid down first, then the wing walls were placed on the bottom in sections. The whole wing tank is a wing wall which is covered with an outside hull plate which extends from 6 to 18 inches from the watertight bulk head between the outside hull plate and the cargo box plate. Where the two outside hull plates meet a butt weld is used to join them. At the location of the butt weld midship of the number 2 and 3 wing tanks a backing strip was used. The edges of the hull plates are "V"ed out and a backing strip is welded vertically behind on the inside of the hull plates and the base of the "V" was filled with weld metal so that a solid metal butt joint was formed. One hull plate was backed by the watertight bulk head but the other hull plate was not.

The credible evidence at trial indicated that Nashville Bridge Co. was a reputable manufacturer and builder of barges. The credible evidence further indicated that Barge ART–629B was built in conformance with industry standards and designed to carry a load of approximately 1600 tons. Maintenance records for the Barge showed that it was inspected and repaired on an on-going basis.

Its history of trips made during the two-year period preceding the casualty showed that it carried various cargoes without incident including a cargo of approximately 1,637 tons of corn from Clinton, Iowa to the New Orleans, Louisiana area during May and June, 1989 and a cargo of 1,385 tons of corn pellets from Cairo, Illinois to the New Orleans, Louisiana area in late June and July of 1989. It had carried cargoes of soybeans and corn weighing approximately 1,650 tons on two occasions in early 1988.

Of the eighteen barges to be loaded for Inland Steel, ten to twelve of them had been loaded prior to the loading of Barge ART–629B without incident. On the morning of August 11, 1989, the Barge was prepared for loading of the iron ore pellets. It was made up end to end with another barge to be loaded, and the two barges were positioned at the Peabody Dock so that Barge ART–629B was positioned against the cells of the dock with the other barge upriver.

Conagra employees, Eugene Bass and Harold Willard, inspected the void compartments of the Barge prior to loading and found the Barge was in apparent good order and was not taking on water. The Barge was rigged for loading by them by the attachment of the appropriate winch cable and breast wires. After the Barge was rigged for loading, Conagra employee Ron Underwood, commenced loading.

It was Underwood's standard practice to load a barge like ART–629B in piles unless he was given specific loading instructions. He testified that he was not given any instructions as to the loading of the Barge. ART–629B was to be loaded to a nine foot draft. A nine foot draft is the generally accepted draft for loading a barge like ART–629B. Underwood anticipated loading five piles of 250 tons across the bottom of the cargo box and then filling the balance in the middle. This type of loading is commonly

referred to as a one pass loading operation. The barges were positioned so that the stern of ART–629B was underneath the loading chute. While sitting up above the barges and operating the loading chute, Underwood made one pass and put five piles of approximately 250 tons of the iron ore pellets in the cargo box.

While Underwood made his one pass, Bass and Willard remained on the Barge to call and signal to Underwood the draft marks on the corners of the Barge. Bass called out the first set of drafts upriver or bow end of the Barge. These drafts were 8 ft. on the bank side of the Barge and 8ft.2in. on the dock side of the Barge. Meanwhile, Willard called his first set of drafts from the stern end of the Barge. The draft marks on the stern end were between 8ft.6in. and 8ft.9in. Bass then called out a second set of draft marks of approximately 8ft.9in.

Underwood then positioned the center of the Barge immediately under the loading chute and dumped an additional estimated 350 tons of iron ore pellets directly onto the center pile. As loading neared completion, Bass and Willard (still on the Barge) heard noises and felt vibrations. Bass testified that the barge began to make a pinging noise, and then a creaking noise. He knew the Barge was sinking. He ran towards the bow of the Barge looking behind him. He saw the Barge going down in the middle and the bow was coming up. When the bow of the Barge had risen drastically, he jumped onto the other barge tied to ART–629B. Willard testified that he was on the stern end of the Barge when he heard cracking and popping noises and felt vibrations. He testified that this went on for about three minutes, then he heard one loud bang. He realized that the Barge was folding up and sinking. He jumped off and swam ashore.

Neither men called out to Underwood or signalled to him in any manner when they heard the noises and felt the vibrations as Underwood completed the loading. Underwood testified that as he was finishing off with the center loading, he heard a big pop or cracking noise. He saw the Barge buckle in the middle and sink.

Salvage operations were attended by surveyors for both the Barge's owner and Conagra. Subsequent to the sinking, the cargo was removed from the Barge. After the Barge was raised and placed on drydock, there was found a tear approximately six to eight feet in the outer hull plate between wing tanks 2 and 3 on the starboard side of the Barge. This tear was only a few inches from the center of the Barge where it had folded. The parties disagree as to when this tear occurred. The defendant contends that due to stress fatigue (from constant loading and unloading), the hull plate opened up permitting flooding of a wing tank which ultimately led to the buckling and sinking of the Barge. The plaintiff contends that the tear occurred after the sinking, probably the result of unfolding the Barge during salvage operations and that the buckling and sinking of the Barge was due solely to the defendant's method of loading; i.e. overloading to the center rather than the load being evenly distributed throughout the cargo box.

At the time of the sinking, a policy of hull insurance issued by plaintiff St. Paul was in full force and effect insuring ARTCO for damages and loss to the Barge and its cargo. As a result of the damage to the Barge and its sinking at the Peabody Dock, ARTCO incurred costs and expenses to salvage, raise and repair the Barge and its cargo, surveying expenses, expenses for recovery and transfer of the cargo, the value of cargo lost, and other incidental and consequential costs and expenses. These included, among other items, $33,000.00 to Okie Moore Diving and Salvage; $131,014.12 to National Maintenance & Repair; $9,231.80 to Merrill Marine Services, Inc.; and $3,145.22 to Inland Steel. The fair market value of the Barge exceeded the cost of raising and repairing it.

On January 19, 1990 plaintiff St. Paul paid and reimbursed ARTCO a total of $152,-419.83 pursuant to claims and statements of loss presented to it by ARTCO in accordance with the policy of hull insurance issued by St. Paul. On May 10, 1990 plaintiff St. Paul reimbursed ARTCO for $3,145.22 paid to Inland Steel. St. Paul is subrogated to ARTCO's claim against Conagra to the extent of these payments. The parties have stipulated

to the fact that these payments were for fair, reasonable and necessary charges for raising and repairing the vessel, for costs and expenses incidental thereto, and for payment of the value of the lost cargo. The parties have further stipulated and agreed that in the event St. Paul is entitled to recover judgment in this cause of action, then St. Paul is entitled to recover prejudgment interest on such judgment at the rate of eight percent (8%) per annum from the dates that plaintiff paid the relevant amounts to its insured.

Plaintiff seeks to impose liability upon defendant by contending that defendant, as a bailee or stevedore, failed to exercise ordinary care in loading the barge. Defendant counters by averring that Barge ART–629B was not furnished for loading in a seaworthy condition and that the sinking of the barge was due to a latent defect in the hull plate undiscoverable by defendant in the course of exercising ordinary care in loading the barge.

■ Delivery of Barge ART–629B to defendant Conagra for loading created a bailment. *Ohio River Co. v. Peavey Co.*, 731 F.2d 547 (8th Cir.1984), *reversing on other grounds*, 556 F.Supp. 87 (E.D.Mo.1982); *Matter of Flowers*, 526 F.2d 242, 244 (8th Cir.1975); *Federal Barge Lines, Inc. v. Granite City Steel*, 608 F.Supp. 142, 148 (E.D.Mo.1985), *appeal dismissed*, 774 F.2d. 1169 (8th Cir.1985). A bailment obligates the bailee to exercise ordinary care to protect the subject of the bailment, i.e. in this case, Barge ART–629B. *Ohio River Co. v. Peavey, supra; United Barge v. Notre Dame Fleeting and Towing*, 568 F.2d. 599, 602 n. 5 (8th Cir.1978); *Federal Barge Lines v. Granite City Steel* at 148.

■ Even if a bailment had not been created, Conagra would still be held to a duty to exercise ordinary care as a stevedore. *Federal Barge Lines v. Granite City Steel* at 148; *Dravo Mechling v. Standard Terminals*, 557 F.Supp. 1162, 1166 (W.D.Pa.1983). The warranty of workmanlike service requires the stevedore to use the same care and diligence as an ordinary prudent and skillful person would use in loading a barge, such as ART–629B, under the same circumstances as present in this case. *Federal Barge Lines v. Granite City Steel* at 149;

*Dravo Mechling* at 1166, *citing, Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956). A breach of the stevedore's warranty extends liability for all foreseeable and proximate losses incurred as a result of the stevedore's negligence. *Federal Barge Lines v. Granite City Steel* at 149; *Dravo Mechling* at 1166.

There is no dispute between the parties that a bailment was created by the delivery of Barge ART–629B for loading, thereby requiring Conagra to exercise ordinary care in loading the Barge; or in the alternative, that Conagra, as a stevedore, was required to exercise ordinary care in loading the Barge. Defendant contends, however, that it did exercise ordinary care (whether as a bailee or stevedore) and that the Barge was delivered for loading in an unseaworthy condition which could not be discovered prior to loading.

■ Under maritime law, a barge owner has the duty to deliver his/her barge in a seaworthy condition for loading. *The Southwark*, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); *Federal Barge Lines v. Granite City Steel* at 147. The test for seaworthiness is whether the vessel is reasonably fit to carry the particular cargo which it has agreed to transport. *The Southwark*, 191 U.S. at 9, 24 S.Ct. at 3; *The Silvia*, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898). The issue of seaworthiness is a question of fact to be decided by this Court. *Federal Barge Lines v. Granite City Steel* at 147; *Dravo Mechling, supra.*

■ The credible evidence indicates that Barge ART–629B was constructed by a reputable builder in a fashion acceptable industry-wide. William Carrier, a marine surveyor with over twenty years experience and hired by Conagra to survey the sunken barge, testified that Barge ART–629B was originally built in an acceptable manner, that there was no design flaw in it, and that it was of the type commonly used·in the carriage of bulk cargo on the inland river ways, including the type of cargo being loaded the day it sunk. He further testified that given the normal life span of barges such as ART–

629B, i.e. approximately 25 years, Barge ART–629B was still relatively young at the time of the sinking. Another marine surveyor with over fifteen years experience, James Pritchard, testified that the Barge had been well-maintained, with less than half of its life expended, and had been built in conformance with industry standards. After examining the barge in drydock, he found the condition of the steel to be good, the workmanship acceptable, the barge design making it fit to carry a load of 1600 tons (if loaded properly).

Robert Bell, a failure analyst of thirty years experience, viewed the Barge during salvage and drydock. He found no evidence of stress fatigue or any type of construction defect in the hull plating of the Barge.

Conagra's expert was the only person to testify that the Barge had been structurally unfit to carry the cargo of iron ore pellets. Conagra opines that, due to constant loading and unloading, the hull plate weakened, cracked, and thus caused the Barge to take on water as it was being loaded. John Brynildson, a chemical engineer and metallurgist, concluded that the hull plate opened up during loading after viewing the Barge at drydock. After it was raised and placed on drydock, Brynildson observed a large vertical tear of the hull plate adjacent to the back-up strip behind the butt weld of the hull plating between the No. 2 and No. 3 wing tanks on the starboard side of the barge. He testified that due to constant loading and unloading, a fatigue fracture had taken place. He believed that the degree of oxidation in and around the fracture demonstrated that the tear had been present for a long period of time; at least prior to the loading. He further testified that the tear would have been not easily observable because the rub bar (a railing atop the hull plates which helps keep the plates together and aligned, as well as serving as a bumper guard) kept the fatigue fracture butted together. His opinion was that there was a fatigue fracture of the weld seam which gave way when the rub bar came apart during loading. Once the weld seam opened up, the Barge took on water.

The other testifying experts strongly differed with Brynildson's opinion. David Mayberry, a marine surveyor for Conagra, testified that the "fatigue fracture" was a vertical tear in the hull plating that occurred during the buckling of the Barge. He further testified that he had seen numerous barges buckle and then be straightened out during drydock which exhibit the same kind of tear and separation of the hull plates. He stated that this was due to the stress placed upon the vessel from folding up and then being literally unfolded at drydock. William Carrier had no substantive opinion about when the fracture occurred but stated that if such a severe fracture had occurred before loading or during loading, the Barge would have taken on water quickly and not sunk in the manner described by the deckhands. Robert Bell stated that his examination of the Barge at drydock indicated nothing to cause him to believe that the Barge sank due to the tear. He opined that the crack occurred after the Barge buckled because such a crack would open up only if force pushed upon it, not by being pulled apart. He believed that tear occurred during drydock when the Barge was straightened out. He testified that the fracture was actually in the hull plate and not the butt weld seam, thus it could not have been a fatigue fracture. James Pritchard testified that he observed the tear, at drydock, but that it did not seem unusual to him. He further testified that even if the tear was closed prior to loading (and thus undetectable), the Barge would still take on water after loading 300—400 tons of cargo.

After reviewing the evidence and the experts' testimony, the Court concludes that Mr. Brynildson's opinion is accorded little weight. Mr. Brynildson had little, if any, background in the marine industry, especially with regard to barges. He testified that he had no real knowledge about the structural integrity of barges, that he had never been involved in designing a barge and had never reviewed blueprints of a barge prior to this case, and that he was unfamiliar with welding on barges or the method by which barges are assembled from prefabricated sections. He had never been in the wing tanks or cargo hopper of a barge before this case.

Most disturbing about his testimony was his total unfamiliarity with the concept that barges do in fact buckle from overloading in

the center. He admitted that he had never heard of a barge buckling before and that he had no idea of what a "buckling" would look like; i.e. the dynamics of a barge buckling. Furthermore, he had assumed that the load was evenly distributed in the barge when making his conclusions. Finally, his deposition testimony describing how he would expect a barge to sink if the butt weld seam opened up, the hull plates separated, and the wing tanks took on water, i.e. the barge would sink unevenly with one end sinking while the other end remaining buoyant and severe twisting and turning of the barge's frame, is inconsistent with the eyewitness account of the buckling and sinking by Conagra's own employees.

Robert Bell, James Pritchard, William Carrier, and Dave Mayberry are all experts with many years experience in the marine industry. They are all familiar with the design and construction of barges such as ART–629B and have investigated and surveyed damaged buckled barges numerous times. None of them subscribed to Mr. Brynildson's theory of the cause of the sinking.

The Court finds that there simply is no reliable evidence showing that a fatigue fracture existed in Barge ART–629B prior to or at the time of loading which opened up during the loading operation and allowed the Barge to flood, thereby causing it to buckle and sink.

This still leaves the issue of whether Conagra was negligent in loading the Barge in the manner it did, thereby causing the Barge to buckle and sink. After reviewing the evidence and the experts' credible testimony, the Court concludes that defendant Conagra did not exercise ordinary care in loading the Barge in the manner it did, and that defendant's negligence was the sole proximate cause for the sinking.

William Carrier's opinion was that the Barge was loaded beyond its structural strength. He testified that the effect of loading an additional 350 tons of cargo in the center was to increase the compressive forces on the wing walls and to increase the sag at the center of the Barge. He described the forces exerted upon the Barge as being so severe that they would cause the center of the Barge to sag several inches below the draft marks on the bow and stern. Although the accepted practice in the industry is to mark the drafts only at the four corners of a barge, conforming to this practice when concentrating the load in the middle leads to inaccurate draft marks. He stated that the natural consequence of concentrating the load in the middle is that the vessel will buckle and sink. It was his opinion that since any barge's weakest point is the center of the cargo hopper, it is vital that a high density load, such as iron ore pellets, be evenly distributed over the bottom of the barge and not concentrated in the middle.

Robert Bell and James Pritchard both concurred with Mr. Carrier's opinion. After viewing the barge during salvage and drydock, and taking into consideration the shape of the barge after it sank, the location of the buckle, and the nature of the metal integrity and tears, Bell concluded that the Barge buckled due to overloading in the center. James Pritchard testified that although the Barge was designed to carry 1600 tons of cargo, and was well-maintained, the concentration of cargo in the middle exceeded the buoyancy capacity of the Barge.

Conagra's main argument (other than Brynildson's theory of causation) that the loading method was not responsible for the buckling is that ten to twelve other barges had been loaded with the same cargo in the same way and had not sunk. The credible evidence shows, however, that less than 1600 tons were loaded in the other barges and that there was a more equitable distribution of the cargo in the other barges.

Defendant Conagra was negligent in employing an improper loading method which concentrated the load at a single point in the center of the cargo hopper instead of evenly distributing the cargo throughout the Barge. This caused excessive stress upon the middle of the Barge. Such stress could, and the Court finds here, did lead to the buckling and sinking of Barge ART–629B.

In accordance with the parties' stipulation and based upon the law and this Court's findings of fact, plaintiff is entitled to recover

damages in the amount of One Hundred Fifty–Five Thousand Five Hundred Sixty Five Dollars and Five Cents ($155,565.05) plus interest thereon at the rate of eight percent (8%) from payment dates of the amounts by plaintiff St. Paul of $152,419.83 on January 19, 1990 and $3,145.22 on May 10, 1990.