**CONSOLIDATION COAL COMPANY, Plaintiff,**

v.

**UNITED STATES STEEL CORPORATION, Defendant.**

**Civ. A. No. 72–315.**

United States District Court,
W. D. Pennsylvania.

Aug. 30, 1973.

Daniel L. Stickler, Rose, Schmidt & Dixon, Pittsburgh, Pa., for plaintiff.

William S. Lerach, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## MEMORANDUM and ORDER

McCUNE, District Judge.

The within case was tried non jury and this is written to explain why we have entered judgment for defendant in the claim of plaintiff Consolidation Coal Company v. United States Steel Corporation and judgment for United States Steel Corporation in the counterclaim of United States Steel Corporation v. Consolidation Coal Company.

On November 13, 1970, Consolidation Coal Company (herein Consol) owned and operated a landing on the Monongahela River at Maidsville, West Virginia, known as the Humphrey Landing where coal from Consol's mines was loaded into barges for transportation up river. On this date a barge (No. 683) owned by United States Steel (herein USS) was delivered by USS to the landing so that it could be loaded with coal for use at the mills of USS. The barge was placed in the empty fleet to await loading. On November 18, 1970, the barge was loaded with about 900 tons of coal and then moved by Consol to the area where the loaded fleet rested to await transportation. The barge then sank despite efforts to keep it afloat and Consol was forced to raise the barge in order to clear the area for the movement of other barges and the carrying on of its normal operations. The cost of the salvage operation was $7769.00 and depreciation of cargo was $2206.11, for which this suit was brought.

Consol alleged in its complaint that the barge was unseaworthy when placed in its hands for loading and that since the barge was unseaworthy, USS must pay Consol for the salvage operation and the damage to the cargo.

USS answered that the barge was seaworthy in all respects when delivered and the sinking was not due to any defect in the barge at the time it was delivered to Consol. Further, USS answered that the barge was in the exclusive possession and control of Consol and the sinking was due to the negligence of Consol because the barge was obviously damaged during or subsequent to the loading process or alternatively, that Consol failed to take proper action to prevent the sinking.

The barge was delivered to Consol at about 3:00 P.M. on November 13, 1970 and remained in the stream (with other empty barges) to await loading until about 3:15 A.M. on November 18, 1970, when it was moved into the loading area where about 900 tons of coal were dumped into it. The river was calm. It was then moved at about 8:30 A.M. to

an area where loaded barges awaited transportation. At about 10:00 A.M. a riverman, Robert Sowell, noticed that the barge had developed a low freeboard. An inspection showed that the barge was taking on water rapidly and in spite of efforts to pump the water from the barge it sank at about 10:30 A.M. Upon being raised on November 26, 1970, a large hole was found (about 8″ x 10″) in the side of the barge at a location about 10 inches under water. The hole would have been somewhat further underwater when the barge was loaded.

Before the sinking Consol employees checked the barge visually from time to time and found no abnormal amount of water in the barge. From all appearances the barge was resting normally and visual inspections showed nothing unusual. Just before loading it was pumped dry and was found to be normal.

█ The barge had gone into use on February 4, 1949, and was repaired from time to time, the last general repairs having been made on October 14, 1970. The side plates were ⅜ of an inch thick when the barge was manufactured and although the barge had been used extensively there was no indication from any source that it was in disrepair. It was in average condition according to the report of Consol's expert. Consol's expert when asked whether the barge was unsuitable said he did not know whether it was unsuitable or not but he testified that he could not call it unseaworthy. USS called an expert who said the barge was seaworthy. We believe it was seaworthy.

As the barge was moved from under the tipple where it was loaded it was in tandem with another barge, the two being tied together with barge No. 683 being located up river (toward the tipple). A tug pulled the barges out from the loading area, they drifted down river for about 1000 feet toward the loaded fleet area at about 5 mph. When they reached what are known as the mooring cells, the motor tug pushed them against

the cells where they scraped along the cells for a short distance. This slowed the barges and brought them to a stop as was intended after which they were tied to the mooring cells which are round steel pilings driven into the river bed. Two other barges were then similarly floated down river and pushed in so that they scraped along the out river side of the two already in place. The barges were moored to await transportation up river.

It is apparent that something gouged a hole in the side of barge No. 683. No one can account for a projection large enough to gouge a hole of this magnitude but there can be no conclusion but that the hole was caused in some way when the barge was moved from the tipple to the mooring cells or when the other barges scraped the side of No. 683. It is certain in our view that the hole permitted water to enter the barge and cause the sinking.

It is not known which side of the barge was gouged because the barge has no designated stern or bow and thus no starboard or lee and no one knows whether the hole was located on the in river side next to the mooring cells or the out river side next to the other barges but pictures of the hole were taken and it is clear that the barge was gouged and torn by something, some projection or sharp object strong enough to gouge and tear.

The testimony shows that Consol was in exclusive control of the barge as a bailee and the bailment was for the mutual benefit of the parties.

██ In the usual case (as in the counterclaim here) the bailor brings suit against the bailee for damage to his vessel. In all of the cases cited to us this has been the situation and in the cases cited the law is clearly set forth that once the bailor has established by a preponderance of the evidence that his vessel was seaworthy when delivered, a presumption arises that the bailee was negligent and the bailee is liable unless

he can rebut the presumption by showing that he was not negligent, The E.T. Halloran, 111 F.2d 571 (2d Cir. 1940) cert. denied, 311 U.S. 691, 61 S.Ct. 73, 85 L.Ed. 447 (1940). The law is sometimes stated to be that when a bailor proves that his vessel was delivered to a bailee in good condition and returned in a damaged condition he makes out a prima facie case of negligence and imposes on the bailee the duty of going forward with the evidence under penalty of losing the suit, Orrell v. Wilmington Iron Works, 185 F.2d 181 (4th Cir. 1950). The bailee may overcome the prima facie case by proving affirmatively that he exercised that degree of care which the bailment in question called for or that the loss was due to causes in no way connected with a lack of proper care on his part. The reason for the rule is twofold, usually if the bailee exercises the degree of care which the bailment demands, that degree of care will be sufficient to prevent loss and secondly, the bailee has the best opportunity of knowing how the loss occurred. When a bailment is for mutual benefit the bailee has the duty to use ordinary care, Orrell v. Wilmington Iron Works, *supra.*

■ But in this case the bailee has sued the bailor, a somewhat unusual situation. The bailee has pled the unseaworthy condition of the vessel as the cause of the sinking and in our view the bailee must prove that condition by a preponderance of the evidence. It is implied in Consol's complaint that the action is one for breach of warranty, i.e., breach of the warranty that every owner implies when he delivers a vessel into the hands of a bailee or charterer that the vessel is seaworthy, and the complaint implies that Consol did not waive the warranty because it pleads that the unseaworthy condition was not disclosed and was not ascertainable in the ordinary course of plaintiff's business.

■ No bailment contract was introduced in this case and perhaps the contract is an oral one, the terms of which depend on custom because these parties have been engaging in business for years. There is, of course, an implied warranty which the owner of a vessel implies in all cases that his vessel is seaworthy. That warranty may, of course, be breached. It may also be waived but when there is a suit by a bailee or charterer against an owner for breach of the implied warranty of seaworthiness the action proceeds as any other contract action. See Robinson on Admiralty, Hornbook Series, page 605.

The conclusion, therefore, is apparent, that Consol was required to prove the unseaworthiness of the vessel and in our view it failed.

Therefore, judgment will be entered for the defendant in the suit by Consol against USS.

In the counterclaim USS having proven that it delivered the vessel to Consol in good condition and received it in damaged condition, the burden shifts to Consol to explain the accident and absolve itself. Consol has failed. Accordingly, judgment will be entered for USS on the counterclaim in the sum of $258.-00 with interest.

This memorandum shall be deemed to comply with Rule 52.

### ORDER

And now, August 30, 1973, in the suit of Consolidation Coal Company v. United States Steel Corp. judgment is entered for defendant.

In the counterclaim of United States Steel Corp. v. Consolidation Coal Company, judgment is entered for United States Steel in the amount of $258.00 with interest.