The SHIPPING CORPORATION
OF INDIA LTD.

v.

SUN OIL COMPANY.

Civ. A. No. 81–659.

United States District Court,
E.D. Pennsylvania.

July 28, 1983.

John P. McMahon, New York City, for plaintiff.

Thomas E. Murphy, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This admiralty case arises out of a contractual dispute. The defendant, Sun Oil Company (charterer), twice chartered the MAHARSHI DAYANAND (vessel) owned by the plaintiff, the Shipping Corporation of India, Ltd. (owner), to carry two cargoes of crude oil. The dispute concerns the calculation of demurrage, which is liquidated damages for delay provided for in a charter party. Plaintiff brought this action to recover unpaid demurrage and all costs of this suit and attorneys' fees. Defendant has counterclaimed for $8,742.50 it alleges was erroneously paid as demurrage for a weath-

er delay. Jurisdiction is governed by 28 U.S.C. § 1333 since the principal subject matter of the contract is maritime. Before me are the parties' cross-motions for summary judgment.

After considering the stipulations of facts submitted by the parties, the language of the charter form and the facts in the light most favorable to the plaintiff, I conclude that judgment should be entered in favor of the defendant on both the complaint and the counterclaim. A brief statement of the facts follows.

## I

### A. THE CHARTER FORMS

Plaintiff, the Shipping Corporation of India, and defendant, Sun Oil Company, entered into a contract of charter party dated January 9, 1979 (the first charter) and one dated December 10, 1979 (the second charter) under which the tanker MAHARSHI DAYANAND was to carry a port cargo of crude oil and/or dirty petroleum products. The charter form in each case was the ASBATANKVOY 1977 charter as modified by the parties. The ASBATANKVOY charter form is in all material respects identical to earlier versions entitled ESSONVOY and EXXONVOY 1969 charters. The key clauses in dispute are:

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

. . . .

SUN LIGHTERING CLAUSE: If lightering is required to berth at a discharge port, it may be necessary to lighter the vessel while anchored at anchorage. Laytime at anchorage (whether or not

the vessel is on demurrage) shall begin six (6) hours after receipt of Notice of Readiness by Charterers or when first lighter barge arrives alongside, whichever occurs first, and shall end when vessel weighs anchor to proceed to a berth. Laytime shall begin again upon the vessel's arrival in berth (i.e., all fast at the discharging wharf). Although the time used in such lightering shall count as laytime, such anchorage shall not be considered a second discharge port or second discharge berth and running time from anchorage to such discharge port or berth shall not count as laytime (whether or not the vessel is on demurrage).

## B. THE FIRST CHARTER

Pursuant to the first charter, the MAHARSHI DAYANAND loaded a cargo of crude oil at Hound Point, Scotland to be discharged at Nederland, Texas. The vessel arrived at Hound Point anchorage on January 18, 1979, and at 600 hours on January 18, the vessel tendered notice of readiness to load a cargo of crude oil at the loading port anchorage. The notice of readiness was accepted at this time. Hound Point Terminal is an offshore terminal with one berth. When the MAHARSHI DAYANAND arrived at Hound Point loading port, another vessel was in the berth which required the MAHARSHI DAYANAND to wait until the berth was free. The parties agree that because of conditions and events at the loading port, allowed laytime had been exhausted prior to the time that the vessel shifted from anchorage to berth. The sequence of events at the loading port may be summarized as follows:

| TIME | DATE | ACTIVITY |
| --- | --- | --- |
| 1600 | 1/18/79 | Vessel at anchorage tenders notice of readiness. |
| | 1/19/79 | Berth becomes available sometime this date; unknown if it was before or after next event. |
| 400 | 1/19/79 | No vessels permitted to berth because of bad weather. |
| 1900 | 1/20/79 | |
| 657 | 1/28/79 | Vessel weighed anchor. |

| TIME | DATE | ACTIVITY |
| --- | --- | --- |
| 948 | 1/28/79 | Vessel berthed. |
| 1042 | 1/28/79 | Vessel began deballasting. |
| 1545 | 1/28/79 | Vessel completed deballasting. |
| 746 | 1/29/79 | Vessel completed loading. |
| 845 | 1/29/79 | Vessel's hoses disconnected. |
| 1011 | 1/29/79 | Vessel left loading berth. |

The vessel arrived at Nederland, Texas to discharge the cargo on February 18, 1979. The vessel tendered notice of readiness to discharge at the discharging port at 0942 hours on February 18, 1979. Such notice of readiness was received at that time. The sequence of events at the discharge port was as follows:

| TIME | DATE | ACTIVITY |
| --- | --- | --- |
| 942 | 2/18/79 | Vessel at discharge port tenders notice of readiness. |
| 419 | 2/19/79 | Vessel weighed anchor. |
| 1225 | 2/19/79 | Vessel berthed. |
| 700 | 2/21/79 | Vessel completed discharge. |
| 715 | 2/21/79 | Vessel's hoses disconnected. |

The rate of demurrage payable under the charter was $10,760 per day and *pro rata* for part of a day. Owner submitted an invoice in the amount of $105,986 for 9 days, 20 hours and 24 minutes demurrage, which included the following periods of time:

A. 0400 hours on January 19th to 1900 hours on January 20th.

B. 0657 hours to 0948 hours on January 28, 1979—Time consumed in moving from the loading port anchorage to the loading berth.

C. 1042 hours to 1545 hours on January 28, 1979—Time consumed discharging ballast.

D. 0942 hours to 1542 hours on February 18, 1979—First six hours waiting time after tender of notice of readiness at the discharging port.

E. 0419 hours to 1225 hours on February 19, 1979—Time consumed in moving from the discharging port anchorage to the loading berth.

Charterer presented a revised demurrage calculation. Charterer calculated demur-

rage to have been 7.224306 days and paid $77,733.53. Initially, charterer deducted one-half of the time between 2200 hours on January 18th to 2400 hours on January 21st on the ground that the port was closed because of bad weather. Owner acknowledged that it failed to make an allowance for the closure of the port because of bad weather, but asserted that the port was closed only from 0400 hours on January 19th to 1900 hours on January 20th, rather than the period claimed by charterer. Ultimately, charterer accepted owner's contention regarding the duration of the closure and remitted to owner what it calculated as the difference between 37 hours half-time previously deducted for port closure and 19 hours, 30 minutes half-time counted by owner. Charterer refused to pay demurrage for the periods of time referred to in paragraphs B–E above on the ground that under the provisions of the first charter, such periods of time did not count toward time on demurrage. In addition, charterer has alleged that its payment of demurrage at one-half the agreed rate for the period of weather delay was made in error because the weather delay occurred before the vessel went on demurrage. Accordingly, the charterer has asserted a counterclaim for $8,742.50.

## C. THE SECOND CHARTER

Pursuant to the second charter, the MAHARSHI DAYANAND was loaded with a cargo of crude oil at La Skhirrah, Tunisia to be discharged at Marcus Hook, Pennsylvania. The vessel tendered notice of readiness to load at the loading port on arrival at 0830 hours on December 18 and sailed at 1930 hours on that day. When the ship sailed on December 18, 1979, allowed laytime had not yet expired.

The vessel completed its second voyage and arrived at Marcus Hook, Pennsylvania on January 2, 1980 at 1500 hours. The vessel's notice of readiness to discharge was tendered and received at that time. The events at the discharge port may be summarized as follows:

| TIME | DATE | ACTIVITY |
|---|---|---|
| 1500 | 1/2/80 | Vessel at discharge port tenders notice of readiness. |
| 935 | 1/7/80 | Vessel weighed anchor. |
| 1645 | 1/7/80 | Vessel berthed. |
| 1527 | 1/8/80 | Vessel completed discharge. |
| 1645 | 1/8/80 | Vessel's hoses disconnected. |

The MAHARSHI DAYANAND went on demurrage while waiting at the discharge port between January 2 and 7. Owner submitted an invoice in the amount of $57,155.28 for 4 days, 1 hour and 5 minutes of demurrage which included the period from 0935 hours to 1645 hours on January 6, 1980 which was consumed in moving from the discharging port anchorage to the loading berth. Charterer refused to pay demurrage because they claim that the second charter does not obligate them to pay for the time spent shifting.

In addition, the rate at which demurrage is payable is in dispute under the second charter. Owner calculated demurrage at the rate of $14,129.375 per day or 117.5% of the Worldscale demurrage rate. Charterer contends that the demurrage rate followed the freight rate and therefore, used a split rate to arrive at a demurrage amount.

## II

### A. CONTRACTUAL INTERPRETATION OF DEMURRAGE

Charterer contends that the six hour notice time described in clause 6 and the time spent shifting and deballasting should not be included in a demurrage calculation because those activities are excluded or excepted from used laytime. Owner contends that once the ship is on demurrage the exclusions and exceptions to used laytime no longer apply. The language of the charter party must be interpreted in order to determine the proper outcome of this case.

The term "charter party" often shortened to "charter" designates the document in which are set forth the arrangements and contractual engagements entered into when one entity (the charterer) takes over the use of the whole of a ship

belonging to another (the owner). G. Gilmore & C. Black, The Law of Admiralty § 4–1, at 193 (2d ed. 1975). The charter party is a contract and is therefore subject to all the rules and requirements of contract law. *Id.* at 195. The law of charters is federal law. *Id.* at §§ 1–17, 4–7.

■ The law of contracts attempts the realization of reasonable expectations that have been induced by the making of a promise. 4 Williston on Contracts § 601 (3d ed. 1961). A contract is to be considered as a whole and if possible, all its provisions should be given effect. *Brennan v. D.J. McNichol Co.,* 439 F.Supp. 499 (E.D. Pa.1977); 4 Williston on Contracts § 601 (3d ed. 1961). The court should attempt to give meaning to every part of a contract and should attempt to read all provisions as being compatible whenever possible. *Thermice Corp. v. Vistron Corp.,* 528 F.Supp. 1275 (E.D.Pa.1981). The manifest intention of the parties is paramount and the court will adopt the interpretation, which under all circumstances of the case, ascribes the most reasonable, probable and natural conduct to the parties. *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 483 F.Supp. 1185 (E.D.Pa.1980). In this case, the charter contract and the disputed clauses will be read as a whole to determine the proper meaning of the term "demurrage."

The period of time used by a vessel at the loading and discharged ports is known generally as used laytime. 2B Benedicts on Admiralty § 31, at 2–1 (7th ed. 1982). In this case, a certain amount of time at the loading and discharging port was designated "allowed laytime." It was agreed that allowed laytime constituted 72 running hours. The charter excludes from the used laytime calculation these 72 hours and certain other activities at port. *See* ASBA-TANKVOY charter, clause 7, *supra.*

■ After the allowed laytime has expired, the charterer is liable for delay according to an agreed daily or hourly rate of liquidated damages known as demurrage. *Id.* The vessel is then sometimes referred to as being "on demurrage," a term that has caused much confusion. Demurrage is intended to compensate the owner for freight it has lost because the vessel was not free when the parties agreed it would be. Shipowners rely on the maxim "once on demurrage, always on demurrage," to support the broadest and most inclusive calculation of demurrage. Although this maxim once received general acceptance, its strength has been eroded in recent years. *Id.* § 41, at 2–57. There are three instances in which the charterer is not liable for demurrage: (1) specific exonerating clauses in the charter party; (2) the delay being attributed to the fault of the shipowner or those for whom he is responsible; and (3) a *vis* major amounting to a sudden or unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers. *United States v. Atlantic Refining Co.,* 112 F.Supp. 76 (D.N.J.1951).

With respect to both charters, there is a dispute over how demurrage should be calculated. With respect to the second charter, there is also a dispute over the rate at which the demurrage was payable. The focus of this problem is the interpretation of the demurrage clause, clause 8, and whether the specific exonerating clauses in the charter party, clauses 6 & 7, remain in effect once the vessel is on demurrage. The controversial language extracted from clause 8 states:

> Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for *all time loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified.*

Plaintiffs argue that the maxim "once on demurrage, always on demurrage" is evidence of the absolute nature of demurrage and that once the allowed laytime has expired, then all time thereafter is time on demurrage. Furthermore, they argue that any clauses specifically excluding certain activities from used laytime are irrelevant once the vessel is on demurrage. Defendants argue that the time excluded from laytime by clauses 6 & 7 should not be

included in a calculation of demurrage under the specific terms of the contract read as a whole.

## B. SIX HOUR NOTICE TIME

A number of arbitration panels have confronted the same issues as those presented in this case. The most frequent focus of this debate is the notice of readiness clause. *See* ASBATANKVOY charter, clause 6, *supra*. Upon arrival at anchorage at each port of loading or discharge, the vessel operator gives the charterer notice that the vessel is ready to load or discharge cargo. The effect is that laytime commences upon the expiration of six hours after receipt of this notice.

The arbitration panels are divided as to how the words of clause 8 should be interpreted. A number of arbitration panels found that the words "all time" in clause 8 simply mean that all time after a vessel is on demurrage should count in a demurrage calculation because all exceptions to used laytime are irrelevant once a vessel is on demurrage. *Rederi A/B Sally (Pegny) v. Amerada Hess Shipping Corporation*, S.M.A. 1015, (N.Y.Arb.1976); *Antco Shipping Company Limited (M/T El Brega) v. Upe Chemicals of Lugano Switzerland*, S.M.A. 1130 (N.Y.Arb.1977); *Astro Campeon Cia. Nav. Sa. (M/T Clairhill) v. Ilford Shipping and Trading Corporation, Limited*, S.M.A. 1126 (N.Y.Arb.1978); *Andros Campania Maritima, SA (Kissavos) v. Marc Rich and Co. A.G.*, S.M.A. 1292 (N.Y.Arb.1977); *Vencedora Havegacion S.A. (Kapetan Markos N.L.) v. Champlin Petroleum Company*, S.M.A. 1373 (N.Y.Arb.1979). One of these panels reasoned that if the parties meant that demurrage was to be paid for all laytime used in excess of allowed laytime the charter would have contained the words "all laytime" rather than all time. *Rederi A/B Sally (Pegny) v. Amerada Hess Shipping Corporation*, S.M.A. 1015 (N.Y.Arb.1976). Thus, these panels found that barring any language to the contrary, once the 72 hours of allowed laytime expired, the maxim "once on demurrage, always on demurrage" took effect with the result that exceptions to laytime were no longer applicable. *Id.*

The panels in a second group of arbitration decisions interpreted the words "all time" differently and reached the conclusion that the charterer was not liable for the six hour notice time once the vessel went on demurrage. *Sun Shipping & Trading Co., (M/T Sunarussa) v. Joc Oil Ltd.*, S.M.A. 1205 (N.Y.Arb.1978), *Estreela Tropica Navegacion, S.A. v. Golden Eagle Liberia Limited*, S.M.A. 1292 (N.Y.Arb.1979). The *Estreela* panel stated:

> While it is an interesting play on words, the "all time" obviously modifies loading, discharging and used laytime. No other sensible meaning can be read into the clause. If "all time" does, in fact, mean any and all time, why would the drafter of the clause have exerted the effort of specifying the categories which they did?

The *Estreela* panel thus concluded that the charterer was never liable for the six hour notice time.

Another panel that ruled in the charterer's favor interpreted the words of clause 8 as a whole instead of just focusing on the words "all time." The panel's interpretation was based upon the complete phrase "all time loading and discharging and used laytime as elsewhere herein provided *exceeds* the allowed laytime as elsewhere herein specified." *Carras (Hellas) Ltd., (M/T "Ioannis Carras") v. Amerada Hess Shipping Corporation*, S.M.A. 1544 (N.Y. Arb.1981). The panel recognized that if the charterer had no right to any further laytime once allowed laytime has expired, then there could never be any "excess" laytime. *Id.* The *Carras* panel continued:

> Since it is axiomatic that an excess of anything must be more of the *same* then it follows that the terms and conditions in the charter relative to the running of or exemptions from laytime must continue in force until the discharge is completed and the hoses disconnected. That is the only way that the total laytime can be determined and by deducting the allowed laytime, establish the "excess" laytime for which demurrage is paid.

Another group of arbitration panels held that the six hour notice of readiness did not

count in a demurrage calculation by interpreting clauses 6 & 8 together. *Atlantic Monarch Shipping Company Limited v. Hess IL & Chemical Division Amerada Hess Corporation,* S.M.A. 939 (N.Y.Arb.1975); *Mammoth Bulk Carriers, Ltd. (M/T Viborg) v. Ilford Shipping and Trading, Bermuda,* S.M.A. 1062 (N.Y.Arb.1976); *Sun Shipping & Trading Co., (M/T Sunarussa) v. Joc Oil Ltd.,* S.M.A. 1205 (N.Y.Arb.1978); *Carras (Hellas) Ltd. (M/T "Ioannis Carras") v. Amerada Hess Shipping Corporation,* S.M.A. 1544 (N.Y.Arb.1981). Since waiting at anchor is an activity that may use up laytime, the *Atlantic Monarch* panel began by asking when laytime actually commenced. *Atlantic Monarch* at 7. Like clause 6 in this case, the clause under consideration in *Atlantic Monarch* provided that laytime commenced after the six hours or when the vessel reached the discharge berth. *Id.* Under a strict interpretation of the contract, a number of panels held that the charter was intended to provide the charterer with up to six hours of time waiting at anchorage at loading and discharging ports, whether or not the vessel was on demurrage because laytime does not commence until after the six hour time period has run. *Id.* An English case reached a contrary result and this decision is relied upon by the plaintiffs in this case to refute the *Atlantic Monarch* decision. *R. Pagan & Fratelli v. Tradax Export, S.A.,* (1969) 2 Lloyd's Rep. 150 (Comm.Ct., Q.B.Div.). The *Pagnan* court held that since laytime is exhausted, there is no laytime left to begin and therefore the six hours should count as time on demurrage.

In addition to the contract arguments, there is an economic argument against including the six hour notice time in a demurrage calculation. *See Sun Shipping & Trading Co., (M/T Sunarussa) v. Joc Oil Ltd.,* S.M.A. 1205 (N.Y.Arb.1978). The base rates of the World-Wide Tanker Nominal Freight Scale (Worldscale) have a built-in factor of 96 hours of port time while the charter provided only 72 hours of allowed laytime. The additional 24 hours, or 12 hours at each of the loading and discharge ports, are included in the base rates and are

intended to compensate the owner for activities other than loading, discharging and other exceptions to used laytime. Two panels found that the six hour time fit into this category and to require charterer to pay for it simply because the vessel is on demurrage is to require him to pay twice for the same thing. *Id.*

Some panels continue to give as the sole rationale for their decisions the maxim "once on demurrage, always on demurrage." *Nippon Yusen Kaisha v. Societe Anonyme Marocaine de L'Industrie du Raffinage,* (1979) Lloyd's Rep. 459 (1978); *Cohansey Steamship Company (S/S Vantage Horizon) v. Antco Shipping Company,* S.M.A. 999 (N.Y.Arb.1976); *Inca Compania Maritime, S.A. (M/T Archon) v. Sincerity Marine Corp. of Liberia (M/T Prinkipos) v. Atlantic Richfield Company,* S.M.A. 1501 (N.Y.Arb.1980). Other panels refuse to follow the *carte blanche* application of the maxim because of the many conflicting demurrage interpretations. *Petroleum Transport Limited v. Joc Oil Limited,* S.M.A. 1316 (N.Y.Arb.1979); *Mammoth Bulk Carriers, Ltd., (M/T Viborg) v. Ilford Shipping and Trading, Bermuda,* S.M.A. 1062 (N.Y.Arb. 1976); *Sun Shipping and Trading Co., (M/T Sunarussa) v. Joc Oil Ltd.,* S.M.A. 1205 (N.Y.Arb.1978). One panel stated, "the well established principle of once on demurrage, always on demurrage is based on a colloquialism stretched to absurdity. Furthermore, it has the effect of making a lace doily out of the Exxonvoy charter." *Carras (Hellas) Ltd., (M/T "Ioannis Carras") v. Amerada Hess Shipping Corporation,* S.M.A. 1544 (N.Y.Arb.1981).

## C. SHIFTING

In any charter, clauses are incorporated to stop the running of laytime during activities related to the navigation, maneuvering and management of the vessel. *See ASBA-TANKVOY* charter, clause 7, *supra.* These clauses stop the clock by providing that the activities should not count as used laytime. Shifting from anchorage to berth is one such activity. *Id.*

The arbitration decisions are generally divided on the issue of whether time spent shifting is included in demurrage calculations. Some panels which held that the six hours should count in a demurrage calculation, also held that shifting should not count in the same calculation. *Cohansey Steamship Company (S/S Vantage Horizon) v. Antco Shipping Company*, S.M.A. 999 (N.Y.Arb.1976); *Andros Compania Maritima, S.A. (Andros Sea) v. Sun Oil Company of Pennsylvania*, S.M.A. 979 (N.Y.Arb.1977). Other panels held that shifting should count, whereas the six hours should not count. *Sun Shipping & Trading Co., (M/T Sunarussa) v. Joc Oil Ltd.*, S.M.A. 1205 (N.Y.Arb.1978).

One group of decisions included shifting in a demurrage calculation because those panels interpreted the words "all time" to include all time, regardless of any exceptions, once the vessel went on demurrage. *Astro Campeon Cia. Nav. SA (M/T Clairhill) v. Ilford Shipping & Trading Corporation, Limited*, S.M.A. 1226 (N.Y.Arb.1978); *Mammoth Bulk Carriers, Ltd., (M/T Viborg) v. Ilford Shipping and Trading, Bermuda*, S.M.A. 1062 (N.Y.Arb.1976). Another interpretation of clause 8 is that since the clause did not expressly exclude shifting time from the meaning of demurrage, it should count as such. *Vencedora Havegacion S.A. (Kapeton Markos N.L.) v. Champlin Petroleum Company*, S.M.A. 1373 (N.Y.Arb.1979). Another group of arbitration panels would not include shifting in a demurrage calculation because they found that the words "used laytime" had a significant and special meaning. *Mammoth Bulk Carriers, Ltd., (M/T Viborg) v. Ilford Shipping and Trading, Bermuda*, S.M.A. 1062 (N.Y.Arb.1976); *Andros Campania Maritima, SA (Kissavos v. Marc Rich & Co., A.G.,* S.M.A. 1243 (N.Y.Arb.1977); *R/A Trajan, (Hilmer Reksten Managers) (T/T Fabian) v. Amoco Transport Company*, S.M.A. 1492 (N.Y.Arb.1979). Because individual clauses exempt certain times and events from the category of "used laytime" these acts or events as are specifically treated in the charter party cannot be considered for demurrage calculation purposes regardless of whether the vessel has fully used its allowed laytime. The *Mammoth Bulk* panel further supported their decision with the rationale that the base rate allowed for 96 hours of port time although the laytime is fixed at 72 hours. Thus, to allow compensation for shifting would be to allow double compensation.

## D. DEBALLASTING

Deballasting is another activity related to the navigation of the vessel. Four arbitration boards found that deballasting should not count as demurrage time because ballast is carried at the owner's discretion for the vessel's safety and stability. No board held that deballasting time should count as demurrage time. *Cohansey Steamship Company (S/S Vantage Horizon) v. Antco Shipping Company*, S.M.A. 999 (N.Y.Arb. 1976); *Astro Campeon Cia. Nav. SA (M/T Clairhill) v. Ilford Shipping & Trading Corporation, Limited*, S.M.A. 1226 (N.Y.Arb. 1978); *Vencedora Havegacion S.A. (Kapetan Markos N.L.) v. Champlin Petroleum Company*, S.M.A. 1373 (N.Y.Arb.1979); *Inca Compania Maritima, SA (M/T Archon) v. Sincerity Marine Corp. of Liberia (M/T Prinkipos) v. Atlantic Richfield Company*, S.M.A. 1501 (N.Y.Arb.1980).

### III

Mr. Justice Holmes stated, "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provide further analysis." *Hyde v. United States*, 225 U.S. 347, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912). I will not invoke the maxim "once on demurrage, always on demurrage" as a substitute for reasoning. The conflicting arbitration decisions establish the disagreement and lack of uniformity regarding the demurrage issue in the industry itself. I have reviewed the charter as a whole in order to determine the intention of the parties regarding the meaning of the words contained in clause 8.

Clause 8 specifies a number of contingencies exonerating the charterer from liability for demurrage or reducing the rate at

which demurrage is payable. Plaintiff argues that once a ship is on demurrage, the six hour notice time and the shifting and deballasting exceptions are no longer applicable. Plaintiff further argues that Sun was well aware of this and Sun could have added language insuring that the exceptions would apply once the vessel was on demurrage. In support of this contention, owner points to the Sun Lightering Clause, inserted in the charter by Sun. The pertinent language of this clause reads:

> If lightering is required to berth at a discharge port, it may be necessary to lighter the vessel while anchored at anchorage. Laytime at anchorage (whether or not the vessel is on demurrage) shall begin six (6) hours after receipt of Notice of Readiness by Charterers or when first lighter barge arrives alongside, whichever occurs first, and shall end when vessel weighs anchor to proceed to berth.

Plaintiff argues that if clauses 6 and 7 can be read as if they contained the words "whether or not the vessel is on demurrage," then charterer would not have deemed it necessary to insert that language in the Sun Lightering Clause. The Sun Lightering Clause is Sun's own clause, whereas clauses 6 and 7 are standard clauses found in the ASBATANKVOY charter. Defendants argue that the Sun Lightering Clause is inserted in the charter and is adapted from a booklet written by a broker who is paid by the shipowner. Given the fact that the Sun Lightering Clause is an addition and not part of the ASBATANKVOY form, I do not believe that the incongruity of language between the Sun Lightering Clause and clauses 6, 7 and 8 is determinative of the parties' intention.

■ Clause 8 reads that charterer shall pay for *"all time loading and discharging* and used laytime as elsewhere herein provided exceeds the allowed laytime as elsewhere herein specified." (emphasis added). "All time loading and discharging" must mean all laytime, since the definition of laytime is that amount of time spent loading and discharging. Additionally, to follow the "all time" argument to its logical

extension would require inclusion of voyage time, which the charterer is not required to pay.

■ The Notice of Readiness Clause (clause 6) states that laytime shall commence within six hours after receipt of the notice of readiness. Plaintiff argues that once allowed laytime has expired, there is no laytime to commence, thus all time, including the six hours, should count as time on demurrage. Clause 8 directs that in order to determine the amount of demurrage, the total amount of laytime used must first be determined. Thus, even though a vessel may be on demurrage, nevertheless laytime must always be calculated. Since laytime itself is still being calculated, it is fallacious to state that there is no laytime to commence once the vessel is on demurrage. The difference is that once the vessel is on demurrage, the laytime that will commence after the six hours has run is used laytime rather than allowed laytime. I conclude that the six hours after receipt of notice of readiness should not be included in a demurrage calculation.

The language of clause 8 which states "used laytime as *elsewhere herein provided,"* requires that I must refer back to clause 7 in order to determine what are the exceptions to used laytime. Thus, the exceptions in clause 7 are applicable. Shifting and deballasting are specifically excepted from used laytime in a separate clause of the contract. Viewing the contract as a whole, shifting and deballasting should not be counted in a demurrage calculation because they remain exceptions to laytime.

Additionally, clause 8 states that "the charterer shall pay for all time loading and discharging [in other words, all laytime] and used laytime as elsewhere herein provided [in other words, excluding the shifting and deballasting exceptions in clause 7] exceeds the allowed laytime elsewhere herein specified [72 hours]." Thus, the charterer must pay for excess used laytime. Since an excess of something includes more of the same thing, it·follows that at the end of the voyage, all laytime should be calculated and excepted used laytime should be subtracted

along with the 72 hours of allowed laytime with the remainder constituting time on demurrage. This total would not include all activities specifically excluded from used laytime as well as the six hour port time. The six hour period is not included in demurrage under this theory because laytime does not commence until after the six hours. Therefore, the demurrage clause creates the following calculation: ALL LAYTIME ACTUALLY USED minus ALLOWED LAYTIME equals DEMURRAGE. Applying this equation to the present case, Sun Oil Company is not liable for damages for the six hour notice time and time spent shifting and deballasting.

### IV

The second issue in this case is a dispute whether bad weather interrupts laytime and the consequences to the parties in this case. Under the first charter, the parties agreed that the vessel was delayed by bad weather for 39 hours at the loading port. Once a vessel is on demurrage, clause 8 requires that the demurrage rate should be reduced by one-half if demurrage is incurred by fire, explosion, storms and other stated events. Sun argues that they, in error, paid demurrage at one-half the demurrage rate under the mistaken impression that the weather delay, which closed the port to all vessels, occurred after the 72 hours of allowed laytime had expired rather than before the vessel went on demurrage.

Clause 6 states, in part, "However, where delay is caused to vessel getting into berth after giving notice of readiness for any reason over which charterer has no control, such delay shall *not count as used laytime.*" (emphasis added). This last sentence of clause 6 relieves charterer of responsibility for delays in berthing over which it has no control. *Burmah Oil Tankers Ltd. (M/V Atlantic Empress),* S.M.A. 1506 (N.Y.Arb.1980); *Atlantic Monarch Shipping Company, (M/T Atlantic Monarch),* S.M.A. 939 (N.Y.Arb.1975).

One panel held that weather delay interrupted the running of time and prevented laytime from commencing. *Ore Sea Transport S.A. (M/V Siboto),* S.M.A. 1469 (N.Y. Arb.1980). Thus, in consideration of the foregoing discussion, I conclude that under clause 6, delays for which the charterer has no control are exceptions to used laytime and would generally remain exceptions throughout the voyage. However, clauses 6 & 8 must be interpreted together to determine the manifest intention of the parties. There is language in clause 8 which specifically addresses situations over which charterers have no control. This pertinent language, which follows the first sentence previously discussed in this opinion, states:

> If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm, or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred.

Since these events might accumulate a substantial amount of time, clause 8 addresses these specific risks and requires charterer to pay half the demurrage rate if the vessel is on demurrage once one of the stated events occurs, thereby carving out an exception to the general rule that these events would remain exceptions to laytime throughout the voyage. Defendants in this case contend that they are not liable for any demurrage when the bad weather delay occurred because the vessel was not yet on demurrage. They further argue that the owners would be unjustly enriched if allowed to keep the demurrage payment for the bad weather time.

Plaintiff argues that the counterclaim should be denied because it was the subject of an accord and satisfaction. An accord and satisfaction is contractual in nature and, therefore, must meet the elements of a contract. *Brunswick Corporation v. Levin,* 442 Pa. 488, 276 A.2d 532 (1971). The burden of establishing each and every element of the defense of accord and satisfaction is on the party asserting it. *Suits v. Aetna Casualty and Surety Co.,* 106

Pa. 231, 161 A. 592 (1932). Payment is the satisfaction and discharge of a debt according to its terms, where an accord and satisfaction is the discharge of a demand by the giving and acceptance of something different from, or less than, that to which the creditor is entitled. 1 *C.J.S.,* Accord and Satisfaction, § 1(6) p. 466 (1936). It should be noted that plaintiff cites no cases in support of its position and only reasserts the facts regarding the correspondence between owners and Sun and the agreed demurrage amount in respect of the bad weather time. I am not persuaded by plaintiff's argument especially in light of this lack of authority.

 Defendant argues that the owners would be unjustly enriched if they are allowed to keep the amount paid in respect to bad weather time. If one party is unjustly enriched, he should make repayment to the other. *Meehan v. Cheltenham Township,* 410 Pa. 446, 189 A.2d 593 (1963). No one should unjustly enrich himself at the expense of another by reason of an incorrect mistake of law or fact entertained by the parties. 13 Williston on Contracts, § 1582 (3d ed. 1970). Money paid under a mistake of fact can be recovered. *Gulf Oil Corp. v. Lone Star Producing Co.,* 322 F.2d 28 (5th Cir.1963).

 I conclude that the Shipping Corporation of India was unjustly enriched because the vessel was not yet on demurrage when the bad weather delay occurred and Sun Oil Company is therefore not liable for half the demurrage rate during that period. Therefore, the Shipping Corporation of India will return the $8,742.50 to the Sun Oil Company.

### V

 Finally, the parties dispute the rate at which demurrage was to be paid under the second charter. In the first charter between the parties, the freight rate was set at "WORLD SCALE 80." The demurrage rate was stated as follows: "Basis bill of lading plus 2,500 long tons and in accordance with World Scale and Rate." The second charter between the parties contained different freight and demurrage clauses. Freight under the second charter

was payable on a split rate basis. For the first 65,000 long tons, the rate was Worldscale 117½. For any quantity in excess of 65,000 long tons, the rate was Worldscale 70. The demurrage clause in the second charter stated: "Bill of lading quantity plus 2,500 tons but maximum Vessel's summer deadweight." This demurrage clause did not contain any mention of the rate at which demurrage was payable.

Worldscale is the name of industry-wide standards for calculating freight and demurrage rates. The Worldscale booklet lists rates by weight of the vessel. Thus, charter provisions like the ones in this case mention an agreed weight for the vessel or provide for a change in the rate when the vessel's weight exceeds a certain amount. The Worldscale rates are determined based upon some assumptions about the vessel, the cargo, and the voyage which are discussed in the Worldscale booklet. These assumptions may not hold true for every charter party. Thus, the parties to a charter may increase or decrease the Worldscale rates. The increased or decreased rate is expressed as a percentage of the Worldscale rate. Thus, in the first charter, Worldscale 80 called for freight to be paid at 80% of the Worldscale rate. It is agreed that under the first charter, demurrage was likewise paid at 80 of Worldscale rate.

As I have previously noted, demurrage is akin to liquidated damages for delay. It is an extension of freight to reimburse the Shipowner for time the vessel was retained by the charterer. Thus, where the charter is silent on the rate at which demurrage should be paid, the demurrage rate should follow the freight rate. It is appropriate that it do so in this case. In the parties' past course of dealings with respect to the first charter, the demurrage rate followed the freight rate. In addition, I note that the parties have not disputed that the demurrage is a percentage of Worldscale. They have disputed only what percentage applies. Thus, both parties recognize that in this charter the demurrage rate follows the freight rate at least to the extent that Worldscale governs both demurrage and freight. Given the clearly expressed split rate in the freight clause, the lack of any

rate in the demurrage clause, and the nature of demurrage as an extension of freight, I conclude that under the second charter the demurrage rate was the same split rate as the freight rate.

## VI

Since the defendant is not in breach of the charter, the plaintiff is not entitled to damages, costs or attorneys' fees. Judgment will be entered in favor of the defendant and against the plaintiff on the complaint. For the reasons stated in part IV of this decision, the defendant is entitled to have returned to it $8,742.50 that it erroneously paid to the plaintiff. Judgment will be entered for the defendant and against the plaintiff on the counterclaim in this amount. An appropriate order follows.