**COMPASS MARINE CORPORATION**

v.

**CALORE RIGGING COMPANY.**

Civ. A. No. 87–5056.

United States District Court,
E.D. Pennsylvania.

April 25, 1989.

Thomas M. Jackal and Andrew F. Napoli, Philadelphia, Pa., for plaintiff.

Andrew H. Quinn and John Mattioni, Philadelphia, Pa., for defendant.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This non-jury matter is a suit by plaintiff for damages under a charter agreement for the vessel, Magic. Defendant has counter-claimed claiming certain deficiencies in the vessel. The plaintiff has brought suit based upon the diversity jurisdiction of this court. 28 U.S.C.A. § 1332(a) (West Supp. 1988). There has been no demand for a jury trial. From the hearings on March 27 through March 30, 1989, we make the following findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. The plaintiff, Compass Marine Corporation ("Compass"), was incorporated in Pennsylvania in 1975. The company's main office is in Wilmington, Delaware, and it does business at Chester, Pennsylvania.

2. The defendant, Calore Rigging Company ("Calore"), is a Rhode Island corporation having been incorporated in Rhode Island. The company's main office is in North Kingston, Rhode Island. The president of Calore is Joseph Calore. Calore has about 12 years of marine experience and, prior to that, it made use of outside boats and crews for its marine operations.

3. Compass is in the marine towing business and is the owner of a number of vessels, including a motor vessel, commonly called a tug, named Magic. Magic was acquired in 1982 and fitted with new engines and a Texas bar for towing. She had a 1800 foot, 1½ inch stern towing hawser. On May 19, 1986, Magic had a value of approximately $1,500,000 and the vessel is registered with the United States Coast Guard for towing. She was rigged to tow one barge at a time. The Texas bar is an antichafing device and would require a second pulley to tow two barges.

4. In early 1986, a strike of approximately 40 days effectively shut down Compass and it actively sought funds from charters to pay the debt service on its vessels. It also sought charters to remove the vessels from possible vandalism.

5. In offices of plaintiff in Chester, Pennsylvania on May 19, 1986, the parties Compass and Calore, through authorized officers, signed a month-to-month charter agreement (Plaintiff Exhibit #1) for the tug Magic. The form agreement was provided by Compass. Under the terms of the agreement, the charter was for a minimum of four months and, as charterer, Calore was not to operate Magic in any waters other than those for which the vessel was insured by the charterer. The charter hire charge was $750 per day.

6. According to the agreement, insurance was to have been provided by Calore; however, a separate agreement as to insurance was reached by the parties under which Compass was to obtain insurance and bill Calore for it until Calore could obtain coverage.

7. The charter agreement provided that Calore would maintain the vessel in "good condition, ordinary wear and tear excepted", and that Calore "shall not permit the vessel to deteriorate" to an extent that it is not seaworthy. Calore was to provide and pay the crew and also pay for fuel, use taxes, and repairs. When the vessel was returned, fuel and lubrication oil were to be at the same level as when it was hired. The amount of fuel and lubrication oil on hand at hire was set forth in an addendum to the charter agreement.

8. Officers of Compass were not fully informed of the use that would be made of Magic. The existing insurance coverage did not extend to the St. Lawrence Seaway. Officers of Compass were aware that, at some point, Magic would be taken to New York and then through the Panama Canal to California, but they did not know that Magic first had to go through the St. Lawrence Seaway and Great Lakes to Michigan to pick up barges.

9. At the time of the charter, a survey was conducted with Magic out of the water. In general, the survey showed Magic to be in good condition, with the exception of the deck paint, which was only fair, although all surfaces were covered. The air conditioning unit worked properly at this time. There was a problem with a keel cooler and Compass agreed to a deduction of $3446 from the hiring invoices. The vessel was seaworthy.

10. Plaintiff's Exhibits P–32 through P–39 are photographs which show the hull rudder, and propellers of the vessel at the time of the May 19, 1986 survey. Compass knew that the low speed on the towing cable winch did not work but did not inform Calore nor did it inform Calore that the fuel transfer pump would heat up after being run for 15 minutes. Operations were still possible if the pump was periodically shut down and the winch was run at medium speed.

11. The log of the Magic shows that, while it was in the St. Lawrence Seaway in Canada, she ran aground in mud on June 2, 1986 for about one-half hour. The tug freed herself and, after docking, she was inspected. The barge she was towing was freed on June 4, 1986. The inspection of the Magic after the grounding was above and below water and revealed no damage caused by the grounding. Calore incurred $33,603.74 in total expenses by reason of the June 2, 1986 grounding of Magic as set forth in Defendant's Exhibit # 11.

12. Mr. Andrew Higbee took over as captain of Magic in Canada after the grounding. After the vessel had cleared Canadian waters, she resumed towing. On June 14, 1986, Magic reached Norfolk, Virginia. The gyro compass was not working properly. Mr. Higbee also thought that more fuel filters than normal had to be used on this trip.

13. While Magic was in Norfolk, Virginia, the engineering manager for Compass went on board to inspect for damage caused by the grounding. The captain complained that the wash water was contaminated with oil. On inspection, the manager found a 3-inch crack in the common bulkhead between the fuel oil tank and wash water tank. Although Calore was supposed to make repairs under the charter agreement, the manager repaired the crack temporarily with a Devcon epoxy patch. Permanent repair would have required welding. The gyro compass could not be repaired. Captain Higbee also thought the freeing ports were undersized; there was also concern about the stability of Magic, but nothing could be done to change this.

14. Captain Higbee had inspected the seepage prior to its repair and found that the hole in the bulkhead was caused by corrosion and deterioration in the bulkhead, but this was not known to Compass when Magic was hired. The Magic put to sea and reached Panama. By that time, the sanitation water flow to the toilet was also not working and the generator was broken. The air conditioning had also broken down but was jury-rigged. Up until this point, only one tow line was used. However, on the trip to California, two tow lines were used without an additional pulley on the Texas bar.

15. Calore dispatched a tug for 12 days to assist Magic from Panama up to California at a cost of $52,800. During this time, Magic used a large number of fuel filters. When Magic arrived in San Diego, California, work was done on her for the return trip. Tanks were cleaned out, the gyro compass was repaired, the broken generator was repaired, and extensive welding was done. The cost for welding repairs and work was about $2,700. Calore personnel painted Magic down to the water line while it was in San Diego. There were no problems on the return trip to Chester, Pennsylvania.

16. When the Magic was returned in October of 1986, the strike at Compass was over and she could have been put to work. Compass was unable to make use of Magic because the upper part of the vessel was in very poor condition. On October 15, 1986, Arthur H. Sulzer conducted an independent survey of the tug Magic's hull and he found the bottom of the boat to be in fine condition. The hull, rudder and screws were in good condition. Nevertheless, the vessel was still unseaworthy and Compass refused to accept return of the vessel as it was.

17. After the return of Magic, a survey was conducted, at Calore's expense, on December 5, 1986. The survey showed deck and upper area saltwater stains from an apparent lack of fresh water wash downs. The tow hawser was in such bad condition that it could not be used for towing purposes. It was rusted and frayed, had barbs, and had been crimped. The vessel was rusty, weather had removed paint, steel was banged and bent, and the rear Texas bar was bent and damaged from use of a second towline. A pilot house window was broken. Six fenders were missing. The condition of Magic on its return is depicted in Plaintiff's Exhibits 14, 17 through 22, and 24 through 31.

18. At the time of the return, the fuel oil and lubrication oil in the storage tanks

were not at the levels they had been at the time of the hire. Mr. Calore and officers of Compass agreed at the time of the December survey that 5,000 gallons of fuel oil and 500 gallons of lubrication oil would be necessary to bring levels up to those at the time the vessel was hired. Joseph Calore also agreed to pay for the damaged Texas bar and dent in the stern. Analysis of the lubrication oil in the engine indicated it had not been changed frequently enough.

19. Magic was sold on December 14, 1986. Damages to Magic, which go beyond normal wear and tear and which should be paid for by Calore under the terms of the charter agreement, are as follows:

| | |
|---|---|
| Amount of Fuel & Lube Oil to Bring Up to Charter Level | $ 4,300.00 |
| Tow Hawser Replacement | $ 4,275.00 |
| Exterior Painting | $10,000.00 |
| Interior Painting | $ 2,000.00 |
| New Fenders | $  845.00 |
| Repair Texas Bar & Waist | $ 2,000.00 |
| Pilot House Window | $  250.00 |
| Unpaid Insurance Paid by Compass | $ 5,966.88 |
| Tug & Crane | $  975.00 |
| Improper Deductions from Invoices | $ 5,757.00 |
| Rental from Return and Refusal to Accept to Sale | $45,750.00 |
| **TOTAL** | **$82,118.88** |

20. The charter agreement was a bareboat charter and defendant is not entitled to a verdict on its counterclaim.

## CONCLUSIONS OF LAW

1. The plaintiff has brought this action pursuant to the diversity jurisdiction of the federal courts. 28 U.S.C.A. § 1332(a) (West Supp.1988).

2. A dispute arising out of a charter agreement of a vessel in service is cognizable under the admiralty and maritime jurisdiction of the federal courts, 28 U.S.C. § 1333. *American River Lines, Inc. v. Central Soya Co.,* 524 F.Supp. 246, 248 (N.D.Miss.1981). The saving to suitors clause, found at 28 U.S.C. § 1333(1), however, allows a litigant to obtain federal jurisdiction over, and jury resolution of, an admiralty question by invoking federal jurisdiction on an independent basis. A maritime claim may also be brought in a state court. *Continental Casualty Co. v. Canadian Universal Insurance Co.,* 605 F.2d 1340, 1344 (5th Cir.1979), *cert. denied,* 445

U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980). "[W]hile jurisdiction to decide the litigation may be ... invoked in a federal court on some independent basis, maritime law determines the rights of the parties. *Seas Shipping Co. v. Sieracki,* 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; *Garrett v. Moore–McCormack Co.,* 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; *Chelentis v. Luckenbach S.S. Co., Inc.,* 1918, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171. See discussion in G. Gilmore & C. Black, The Law of Admiralty 456 (2d ed. 1975)." *Id.*

3. The charter is a contract. As such, it is subject to the rules and requirements of contract law. The law of charters is federal law. *Shipping Corp. of India Ltd. v. Sun Oil Co.,* 569 F.Supp. 1248, 1254 (E.D.Pa.1983).

4. "A charter by whose terms the whole vessel is let to the charterer with a transfer to him of its entire command and possession and consequent control over its navigation amounts to a demise of the vessel or a bareboat charter, and the charterer is generally considered the owner for the service stipulated. *United States v. Shea,* 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); *Leary v. United States,* 81 U.S. (14 Wall.) 607, 610, 20 L.Ed. 756 (1871)...." *Lugo v. Transunion Leasing Corp.,* 440 F.Supp. 1067, 1068 (D.Del.1977). The charter party or agreement in the instant case constituted a bareboat charter.

5. When a boat is chartered, a presumption of negligence on the part of the charterer arises if the owner can show delivery of the vessel in good condition to the charterer and damage to the vessel during the charter period. This presumption remains unless the charterer can rebut it by sufficient exculpatory evidence. *Consolidation Coal Co. v. United States Steel Corp.,* 364 F.Supp. 1071, 1074 (W.D.Pa. 1973); *Banks v. Chas. Kurz Co.,* 69 F.Supp. 61, 67 (E.D.Pa.1946).

6. In order to rebut this presumption, the charterer "must either show how the damage occurred and that his negligence did not cause it, or however it happened his

fault had no part in it. [Citations omitted]." *Id.*

7. Normal depreciation constitutes "wear and tear". What is normal "must be responsive to practices in the service for which the vessel is intended. [Citations omitted] ... The effects of negligence are not wear and tear, and they do not become wear and tear merely because they may be anticipated. [Citations omitted]." *Moran Towing Corp. v. M.A. Gammino Construction Co.,* 363 F.2d 108, 114 (1st Cir. 1966).

■ 8. In the instant case, Compass delivered the tug Magic in good and seaworthy condition to Calore, which returned her after the voyage, in very poor condition. Calore has not been able to rebut the presumption of negligence by showing that its negligence did not cause the deterioration in the condition of the tug. This deterioration was not due to normal depreciation and, so, cannot be said to be attributable to wear and tear. Calore is, therefore, liable for the costs of repair and restoration of the tug Magic.

■ 9. An owner is entitled to its charter hire until the vessel is returned in good condition. An owner has no obligation to accept the vessel in a damaged condition or to subject itself to a repairman's lien by ordering the vessel to be repaired. *Cox v. Banks,* 50 F.Supp. 871, 873 (E.D.Pa.1943). In the case at bar, Compass refused to accept the tug because of the poor condition in which she had been returned. Calore is, therefore, liable for the continuing charter rental due from the date of the tug's return until the date of her sale to a third party.

■ 10. Calore also breached other provisions of the charter agreement by failing to pay for insurance and for replenishment of fuel and lube oil, and by making improper deductions from invoices. We find Calore liable for those amounts as well.

■ 11. In a diversity case concerning a cause of action arising under maritime law, the federal admiralty rule concerning pre-judgment interest should be applied.

*Robinson v. Pocahontas, Inc.,* 477 F.2d 1048 (1st Cir.1973). Pre-judgment interest "should be awarded unless there are exceptional circumstances that would make such an award inequitable. [Citations omitted]." *Matter of Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982).

■ 12. Exceptional circumstances occur "when the party requesting pre-judgment interest has (1) unreasonably delayed in the prosecution of its claim, (2) made a bad faith estimate of its damages so as to preclude settlement, or (3) not sustained any actual damages...." *Dravo Mechling Corp. v. Standard Terminals, Inc.,* 557 F.Supp. 1162, 1167 (W.D.Pa.1983), *aff'd mem.,* 729 F.2d 1446 (3d Cir.1984). We find no such exceptional circumstances to exist in the case at bar. Compass is, therefore, entitled to pre-judgment interest.

■ 13. The rate of pre-judgment interest is within the discretion of the court. *Matter of Bankers Trust Co.,* 658 F.2d at 112.

14. "The purpose of pre-judgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the date of such loss until the date judgment is entered. [Citations omitted]." *Dravo Mechling Corp.,* 557 F.Supp. at 1167 n. 11.

■ 15. Compass has requested a rate of six (6%) per cent interest per annum. We find this rate to be reasonable and so allow it from the date of loss until the entry of judgment. The date of loss is the date the vessel was returned.

16. Calore is liable to Compass for damages amounting to $82,118.88. Pre-judgment interest on this sum at 6% per annum comes to $12,000.34. The total amount due from Calore to Compass is, therefore, $94,119.22.

17. The defendant has brought its counterclaim under the admiralty and maritime jurisdiction of the federal courts. *See* 28 U.S.C.A. § 1333 (West 1966).

**182**

18. In every charter agreement, there is an implied warranty on the part of the owner that the vessel is seaworthy. The existence of unseaworthiness must be proven by a preponderance of the evidence. *Consolidation Coal Co.*, 364 F.Supp. at 1074. The counterclaim of Calore, in the instant case, is based upon the alleged unseaworthiness of the tug Magic.

19. The evidence in the instant case indicates that the tug Magic was in seaworthy condition at the time of her delivery to Calore. Calore has failed to sustain its burden of proof on this issue and its counterclaim must be denied.

### ORDER

AND NOW, this 25th day of April, 1989, the court enters a verdict and judgment in favor of the plaintiff Compass Marine Corporation and against the defendant Calore Rigging Company in the amount of $94,119.22. The counterclaim of defendant Calore Rigging Company is herewith DENIED.